(135 P.3d 202)
No. 93,470

In the Matter of the Estate of NORMAN B. HJERSTED, Deceased.

Opinion filed June 2, 2006.

*Michael R. Ong* and *Michelle M. Burge*, of Law Office of Michael Ong, P.A., of Leawood, for appellant/cross-appellee.

*Byron E. Springer*, *William N. Fleming*, and *Terrence J. Campbell*, of Barber Emerson, L.C., of Lawrence, for appellee/cross-appellant.

Before RULON, C.J., ELLIOTT and GREENE, JJ.

GREENE, J.: Maryam Hjersted, surviving spouse of Norman B. Hjersted, petitioned under K.S.A. 59-6a201 to take her spousal elective share of the augmented estate, thus triggering contentious and complex litigation with her stepson and executor, Lawrence Hjersted, regarding valuation of uncompensated nonprobate transfers to Lawrence and to Norman's trust, as well as related issues. Maryam appeals several orders of the district court, including (i) the award of $100,000 as executor fee; (ii) the award of $284,330 as executor expenses and attorney fees and costs; and (iii) the reduction by $10,000 of the value of an uncompensated transfer to Lawrence of a limited partnership interest to be included in the augmented estate. Lawrence, executor of Norman's estate and trustee of Norman's revocable trust, cross-appeals several orders of the district court, including (i) the court's valuation of an uncompensated nonprobate transfer to him of a limited partnership interest to be included in the augmented estate; (ii) the inclusion in the augmented estate of a portion of the proceeds of the sale of certain realty in Nebraska; and (iii) the court's valuation of certain realty in Missouri to be included in the augmented estate. We

analyze each issue framed, affirming the district court on all issues except Lawrence's issue (iii), where we reverse and remand for further proceedings.

## Factual and Procedural Background

Norman J. Hjersted died testate April 28, 2001, survived by his wife of nearly 20 years, Maryam; his son born of that marriage, Timothy; and three children from a prior marriage, Lawrence, Karen, and Ingrid. At some time before his death, Norman apparently visited his attorneys and expressed a desire to disinherit his wife. The following transactions occurred during the last few years of Norman's life, each of which spawned issues for the probate court and this appeal following Norman's death:

### The Restated Norman B. Hjersted Revocable Trust (the Trust).

The Trust was created in 2000 by amendment and restatement of a prior trust agreement created in 1998. The will "poured over" the probate assets into the Trust. At the time of Norman's death, Lawrence was trustee.

### Hjersted Family Limited Partnership (HFLP).

HFLP was created in 1997, and the initial partners were the decedent, who owned a 2% general partnership interest and a 96% limited partnership interest, and Lawrence, who owned a 1% general partnership interest and a 1% limited partnership interest. The decedent transferred all of the outstanding shares of his company, Midland Resources Inc. (MRI), to the partnership, and these MRI shares were the sole asset of the partnership. On March 1, 2000, decedent and Lawrence entered into a part gift/part sale transaction whereby decedent transferred to Lawrence his 96% limited partnership interest in HFLP.

### Nebraska realty/Florida orange grove.

Norman owned a life estate in certain realty in Richardson County, Nebraska, and Lawrence owned the remainder interest. In September 1999, under purported "threat" of condemnation, the property was deeded to the United States Army Corps of Engineers for $292,950. The price included both the life estate and

the remainder interest, but the entire proceeds were deposited into Lawrence's bank account. Lawrence later contributed these proceeds toward the purchase of a Florida orange grove as a like-kind investment. At the time of this purchase, Norman wrote to Lawrence: "It is my intent and has always been that you retain ownership of the Florida Farm. I would like and need some of the profits but not to exceed 5%/year of value of money received from the Corp. of Engineers."

St. Louis Realty.

At some unspecified time prior to his death, Norman conveyed to the Trust his interest in St. Louis, Missouri, realty. The parties stipulated that this property was an asset of the Trust and, therefore, part of the augmented estate, but the parties disagreed as to its value. In March 2000, the property was leased to MRI for a term of 10 years, and the lease contained a provision requiring the tenant to purchase the property at the conclusion of the term for a price to be determined from a formula in the lease agreement.

Following Norman's death, Maryam filed a petition seeking her spousal elective share of Norman's estate pursuant to K.S.A. 59-6a201 *et seq.* Subsequently, the district court admitted the will to probate and appointed Lawrence executor of the estate. Although the parties were able to resolve numerous issues necessary to determine the value of the augmented estate under K.S.A. 59-6a203, unresolved issues prompted a lengthy and complex trial before the district court in June 2003.

Ultimately, after modifications to its original orders, the district court calculated the total value of the augmented estate to be $4,548,333. The court awarded Lawrence $100,000 as executor fee, and awarded his attorneys $233,602.75 in fees, $18,935.69 in costs, and $31,792.03 in expenses. Based upon the length of the marriage, Maryam's elective share percentage under the statute was 50%, and the court determined that her unsatisfied elective share was $1,175,322.

**Overview of the Kansas Spousal Elective Share Statutes**

In 1994, the Kansas Legislature amended the Kansas Probate

Code to incorporate a comprehensive spousal elective share scheme patterned after the Uniform Probate Code. See K.S.A. 59-6a201 *et seq.* The statutory scheme gave the surviving spouse the right to take an elective share amount equal to the value of an elective share percentage of the augmented estate, the percentage determined by a statutory table based on length of the marriage. K.S.A. 59-6a202. For purposes of determining the augmented estate, certain uncompensated nonprobate transfers to others are included, including certain of those during the 2-year period next preceding the decedent's death. K.S.A. 59-6a205 and K.S.A. 59-6a207.

The public purpose of the statutory scheme is to prevent disinheritance of the surviving spouse. Moreover, the scheme is based on two theories of the marriage relationship: the "partnership theory" and the "support theory." The partnership theory of marriage recognizes that both partners have contributed to the accumulated estate, whereas the support theory recognizes that during their joint lives, spouses owe each other mutual duties of support, and these duties continue in some form after death in favor of the survivor, as a claim on the decedent spouse's estate. A comprehensive discussion of the genesis and purpose of the Kansas scheme can be found in *In re Estate of Antonopoulos*, 268 Kan. 178, 180-84, 993 P.2d 637 (1999).

In a situation such as that presented here, upon the election by a surviving spouse, the statutory scheme requires analysis of nonprobate transfers to determine whether assets should be "pulled back" or included in the augmented estate, together with valuation of those assets at date of transfer. K.S.A. 59-6a205 to K.S.A. 59-6a208. Once the augmented estate has been composed generally from the net probate estate and the eligible uncompensated nonprobate transfers, the surviving spouse is entitled to the elective share percentage shown in the statutory table. K.S.A. 59-6a202 to K.S.A. 59-6a203. Award of fees and other administrative expenses reduce the augmented estate for these purposes. K.S.A. 59-6a204.

## Standards of Review

This appeal presents numerous questions requiring construction

and application of Kansas statutes. These questions are entitled to de novo review. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004). To the extent that the district court made fact findings, particularly as they regard valuation issues, we review those findings to determine whether they are supported by substantial competent evidence. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). Substantial evidence is evidence possessing both relevance and substance which furnishes a substantial basis of fact from which the issues can reasonably be resolved. 275 Kan. at 318. We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003).

Lawrence urges us to review the district court's valuation conclusions for an abuse of discretion, citing *In re Marriage of Cray*, 254 Kan. 376, 867 P.2d 291 (1994). *Cray*, however, involved the propriety of the district court's selection of a particular valuation date for marital assets in a divorce proceeding. We do not believe that the discretionary selection of a valuation date in a divorce proceeding is parallel to the complex valuation issues presented in a probate matter, and we decline to adopt an abuse of discretion standard of review for the valuation issues herein.

Attorney and executor fee determinations in probate matters are reviewed for an abuse of discretion. *In re Estate of Somers*, 277 Kan. 761, 89 P.3d 898 (2004).

### *Did the District Court Err in Determining the Value of the Uncompensated Nonprobate Transfer of the HFLP Interest to Lawrence for Purposes of Inclusion in the Augmented Estate?*

Lawrence appeals the district court's valuation of the 96% interest in HFLP conveyed to him in March 2000 by his father. He argues that the district court employed "fair value" rather than "fair market value" and, accordingly, failed to consider or apply discounts for lack of marketability and lack of control that were inherent in his limited partnership interest. Maryam maintains that there is no evidence to demonstrate the district court employed

any valuation other than fair market value and that the court's refusal to consider such discounts was appropriate based on the absence of her consent to Norman's transfer of the interest to Lawrence.

Details of the transaction are essential to our analysis. The March 2000 transaction was achieved partially by gift and partially by sale. The gift portion consisted of a transfer of that extent of the HFLP limited partnership interest having a fair market value of $675,000; this was the maximum transfer without incurring gift tax under the Internal Revenue Code. The remainder of the limited partnership interest was purchased by Lawrence, by a down payment and promissory note in amounts to be determined by an appraisal of the interest. Because the sole asset of the limited partnership was 100% of the MRI stock, the appraisal required by this agreement first determined the stock to be worth $4,500 per share, but then discounted that value by a total of 32.5% to account for the restrictions imposed upon owners of a limited partnership, including lack of marketability and lack of control. Lawrence urged the court to add the value of only the gift portion of the transaction ($675,000) to the augmented estate.

In contrast, Maryam urged the court to adopt her appraiser's value of the MRI stock as of March 1, 2000, which reflected a discount of 10% for lack of marketability, and to include the full value of this stock (without further discounts attributable to limited partnership holding) in calculating the amount of the transfer, a total of 96% of $2,660,000, or $2,553,600. Thus, reducing the value by consideration received (the promissory note [$743,914] and down payment made by Lawrence [$39,150]), Maryam urged the court to add $1,770,536 to the augmented estate by reason of the uncompensated portion of the nonprobate HFLP conveyance in March 2000.

With one caveat, the district court adopted Maryam's calculation of the value of the transfer, finding that although the HFLP "was a valid and existing limited partnership at the time of the gift . . . and continues to be so," the entire value of the limited partnership interest (*i.e.*, without discounts for control or marketability) must be included in the augmented estate because Maryam

did not consent to the transfer. The court agreed with Lawrence, however, that K.S.A. 59-6a205(c)(3) required the court to reduce the amount of this uncompensated transfer by $10,000.

Lawrence initially claims that the district court utilized an incorrect standard of value in computing the value of the HFLP interest. He argues that the district court applied the concept of "fair value" rather then "fair market value." We agree with Maryam, however, that there is nothing to indicate the court used anything other than a fair market value standard. In fact, we find nothing in the record to suggest that any issue of value standard was addressed before the district court, and finding no preservation of an issue in this regard, we decline to analyze this argument further. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003). We note, however, that the crux of Lawrence's argument regarding applicability of certain discounts in the valuation process was preserved and will be addressed below.

Lawrence next argues that it was error for the court to focus on lack of consent in determining whether discounts inherent in limited partnership interests should be ignored. He argues:

"Why is consent an issue? The only relevant issue under the statute is the value of the gift. K.S.A. 59-6a205(c). Certainly, if the surviving spouse gives written consent, then the effect under the spousal election law is that the gift is not considered to be a part of the augmented estate, even if the gift was made within two years of the testator's death. *See* K.S.A. 59-6a208(a). For gifts that are pulled back into the calculation of the augmented estate pursuant to K.S.A. 59-6a205(c), however, the task for the court is to determine the value of the gift, not to selectively apply differing valuation principles for the gifted interest based on whether or not the surviving spouse consented to the gift."

We agree with Lawrence that the trial court erred in its exclusive focus on the lack of consent to the transfer. The proper focus was to determine the value "at the time that the right, interest, or power terminated." See K.S.A. 59-6a205(c)(1). Under K.S.A. 59-6a205 and K.S.A. 59-6a207, consent is irrelevant, and the paramount consideration is to value the "property" at the date of the nonprobate transfer. Here, the transfer was a 96% limited partnership interest in HFLP on March 1, 2000. The value of this property interest

must be included in the augmented estate to the extent that it was not supported by consideration.

On the question of valuation of this interest, there was competing evidence on the value of the MRI shares held by the partnership. The district court weighed the evidence and accepted the appraisal presented by Maryam.

"[A]fter analysis of the written reports submitted by both experts and weighing the testimony provided by both experts, that the opinion of [Maryam's appraiser] is better supported (in particular with regard to use of more recent data concerning the increase in pre tax income in early 2000, the on sight investigation, and the inherent bias to minimize value by [the original appraisal] in performing the task hired for) and the court finds that the value of 500 shares of Midland Resources Inc. to be $2,660,000.00."

We conclude that there is substantial competent evidence to support this conclusion, leaving only the question whether the court's apparent misfocus on the MRI shares rather than the limited partnership interest resulted in error, particularly because of its disregard of discounts for lack of control and marketability purportedly inherent in the fact that the stock was held in a limited partnership.

On this question, we begin by analyzing the result of the transaction. After receiving the 96% limited partnership interest in March 2000, Lawrence owned a 97% limited partnership interest and a 1% general partnership interest. The remaining 2% general partnership interest had already been conveyed to the Trust or was headed there as a result of the "pour-over" provisions of the will; accordingly, the entirety of the partnership interests was unified in Lawrence, either individually or in his capacity as trustee.

Discounts for lack of control and lack of marketability were unnecessary under these circumstances for several reasons:

● Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of such holdings. *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989);

● Control and marketability discounts are not appropriate when the purchaser is either the majority shareholder or the corporation itself. *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, Syl. ¶ 3,

992 P.2d 216 (1999). Similarly, when the result of the transaction unifies the interests of a partnership in the same individual, albeit as an individual and a trustee, such discounting is illusory;

● Where the sole asset of the partnership is corporate stock that has already been discounted for lack of marketability, no further discount is appropriate when valuing the partnership interests because the partnership did not perform a management function for such asset. See *Estate of Bongard v. Commissioner*, 124 T.C. 95, 126-29 (2005) (transfer of stock to a limited partnership does not satisfy bona fide sale exception to 26 U.S.C. § 2036[a] [2000]);

● Where, as here, the artificiality or illusory nature of the partnership entity is manifest by its disregard in practice, including illusory capital contributions, lack of any filing of state or federal partnership tax returns, MRI dividends paid directly to Lawrence and Norman rather than the entity, and charter forfeiture by the State, the separate legal existence of the partnership entity at death does not require discounting that might otherwise be appropriate in valuing partnership interests. See *Estate of Thompson v. C.I.R.*, 382 F.3d 367 (3d Cir. 2004); *Estate of Reichardt v. Commissioner*, 114 T.C. 144 (2000); *Estate of Morton B. Harper*, 83 T.C.M. (CCH) 1641 (2002); *Estate of Dorothy Morganson Schauerhamer*, 73 T.C.M. (CCH) 2855 (1997) (all of which hold that where a decedent's relationship to transferred assets remains the same before and after transfer, the assets transferred are returned to gross estate for estate tax purposes).

● Recognition of discounting under these circumstances could encourage the creation of layers of illusory ownership for nonprobate transfers, each with the potential for additional discounting, and all for the purpose of insulating the true value of assets transferred, in furtherance of a scheme to disinherit a spouse. Such encouragement would be counter to the legislative purpose of the Kansas spousal elective share statutes. See *In re Estate of Antonopoulos*, 268 Kan. 178, 181-82, 993 P.2d 637 (1999); *Ackers v. First National Bank of Topeka*, 192 Kan. 319, 332-33, 387 P.2d 840 (1963).

Although the district court erred in disregarding the proposed discounts due to lack of spousal consent, we may affirm where such

disregard was appropriate for other reasons. See *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 273, 50 P.3d 495 (2002).

The parties raise two related issues regarding the valuation of the HFLP transaction:

(1) Maryam challenges the district court's deduction of $10,000 from the valuation of the partnership interest for purposes of augmentation, and she claims there were additional transfers of $10,000 that should have been considered. We reject this argument, concluding that in the deducting this $10,000, the district court did no more than follow K.S.A. 59-6a205(c)(3) in including the value of property transferred only "to the extent that the aggregate transfers to any one donee in either of the two years *exceeded $10,000.*" (Emphasis added.) Claims to consider additional nonprobate transfers were not preserved below.

(2) Lawrence challenges the district court's failure to consider the liability of MRI created by a deferred compensation agreement between Norman and MRI that was dated March 8, 2000. We reject this argument, concluding that the statute required valuation of the HFLP interest on the date of the transfer, March 1, 2000. Despite evidence that the compensation agreement was intended to be a part of the transaction, the district court found to the contrary, and we decline to reweigh the evidence or redetermine the underlying question of fact. See *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. at 775.

For all of the reasons stated, we affirm the district court's valuation of the HFLP transfer and the resulting addition of $1,760,536 to the augmented estate.

### *Did the District Court Err in Including in the Augmented Estate a Portion of the Proceeds from the Sale of the Nebraska Realty, Based on Norman's Life Estate Therein?*

Lawrence next challenges the district court's decision to include in the augmented estate a portion of the proceeds from the sale of Nebraska realty, arguing that the forced nature of the sale, together with the reinvestment agreement, did not "separate the life estate from the remainder [estate]." Lawrence argues that the reinvestment of proceeds from the sale into the Florida orange grove with

the understanding that Norman would have "5%/year" profits should limit any inclusion of proceeds in the augmented estate to the extent of such unpaid profits, or $23,478. In contrast, Maryam argues and the district court concluded that the augmented estate should include a portion of the proceeds of sale, based upon actuarial tables using Norman's age at the time of transfer and an appropriate interest rate, amounting to $137,393.55. The parties stipulated to these competing values, framing only the question of which conceptual approach was correct.

During the bench trial, the district court ruled from the bench that the only evidence of a reinvestment agreement, a handwritten memo from Norman expressing his desire for 5% profits from the reinvestment, was not an enforceable agreement.

"That's a memorandum of what they discussed, but it's not an agreement. Agreement requires consideration and a contract signed by both parties, and it's not been signed by both parties. It's signed with Mr. Hjersted as to what he expects, so the Court finds that's not an agreement. No written agreement."

We agree. A careful reading of the handwritten memo reveals that it was nothing more than an expression of Norman's desire to receive a portion of the profits from the Florida orange grove. It did not speak to the actual disposal or division of the proceeds from the sale of the Nebraska property. Moreover, no payments were ever made to Norman by Lawrence, based upon the memo. Lawrence's basis for a stipulated amount of unpaid profits to be included in the augmented estate is unsupported by any enforceable agreement.

Lawrence argues that Maryam's conceptual approach is legally flawed, because "the law affirmatively prohibits the district court from separating the life estate from the remainder as part of a forced sale." Lawrence supports this statement with the following quote from treatise law:

"When not required by the exigencies of the situation, the separation of life estates from estates in remainder, by estimating the values of the former and paying such values to the life tenants, constitutes an unnecessary and therefore unauthorized infringement upon the testator's intention. Hence, in the absence of some overpowering necessity, the court has no power to direct the separation of the life estate from the estate in remainder by estimating the value of the former

and paying that value to the life tenant." 51 Am. Jur. 2d, Life Tenants and Remaindermen, § 105, Practice Guide, p. 296-97 (2000).

Lawrence's quotation and associated argument are a bit misleading, however, given that the treatise section begins with the caveat: "When the entire interest in real estate *is sold by court order* . . . ." (Emphasis added.) In fact, the cited treatise expressly notes that "[t]he judicial or nonjudicial character of the sale greatly affects whether a life tenant is entitled, or may be compelled, to receive from the proceeds of a sale of the property which was subject to his or her estate." 51 Am. Jur. 2d, Life Tenants and Remaindermen, § 104, p. 295 (2000). The treatise then fully supports a division of the life estate interest when there has been a nonjudicial sale:

"When a life tenant and remainderman unite in a nonjudicial sale of property, without agreeing as to a division of disposal of the proceeds, the life tenant is entitled to receive, absolutely, from such proceeds the estimated value of his or her estate computed as of the time of the sale." 51 Am. Jur. 2d, Life Tenants and Remaindermen, § 107, p. 299 (2000).

Notwithstanding the district court's characterization of the sale as "forced," we note Lawrence's admission at trial that the sale was entirely voluntary.

"The Army Corp of Engineers came to me asking me if I wanted to sell this property. *I didn't have to sell it.* I got my dad's approval and he signed a document which I don't have, but that was prior, and that document then bound us. At the time we did that, I didn't know that—I didn't know that he would get a division of that. I didn't know that until after we were already bound to do it." (Emphasis added.)

The sale of the Nebraska realty was clearly not a judicial sale, and based upon this admission by Lawrence, it was not truly a "forced" sale either. We adopt the rule set forth above as applicable, that when a life tenant and remainderman unite in a nonjudicial sale of their property, the life estate is entitled to receive the estimated value of his or her estate at the time of sale. We understand that this is precisely what Maryam's approach was intended to achieve.

Given the stipulation as to the numerical calculation, we decline to examine the amount with more precision, and we affirm the

district court's adoption of Maryam's approach together with the resulting inclusion of $137,393.55 in the augmented estate.

### *Did the District Court Err in Its Valuation of the Missouri Realty for Purposes of Inclusion in the Augmented Estate?*

Lawrence next challenges the district court's valuation of Missouri realty on which MRI operates a chemical plant. The property was deeded to the Trust by Norman prior to his death, so the only issue presented to the district court was how the property should be valued for purposes of inclusion in the augmented estate.

At trial, Lawrence presented evidence of an appraisal of the realty conducted at his request that stated the fair market value of this property was $250,000 at the date of Norman's death. Lawrence also presented evidence of various environmental problems associated with this property, but the appraisal did not consider such problems and it is not clear that Lawrence sought further discounts to the appraised value due to such problems. In any event, Lawrence contends on appeal that his appraisal was the sole evidence of fair market value and that the district court erred in concluding otherwise.

Maryam did not present appraisal evidence as to value of this property, but instead relied solely upon monetizing a lease agreement for the property between Norman as landlord and MRI as tenant. According to its terms, MRI was required to pay $5,000 per month to Norman during a 10-year term concluding in March 2010. At termination, the lease provided that the tenant was required to purchase the property at the greater of (i) 10 times annual rental; or (ii) fair market value determined by appraisal. This purchase requirement expressly stated that any such appraisal "not take into account any environmental contamination associated with the Real Estate." Given this lease, Maryam proposed that valuation be based upon the balance of rental payments and 10 times the rental rate, both discounted at 6%, the rate issued by the Internal Revenue Service for federal income tax purposes for April 2001 under § 7520 of the Internal Revenue Code (the § 7520 rate). See Rev. Rul. 2001-17 and 26 U.S.C. § 7520 (2000). The revenue ruling established the rate "for determining the present value of an an-

nuity, an interest for life or a term of years, or a remainder or reversionary interest."

The district court rejected Lawrence's appraisal and adopted Maryam's approach to value of this property:

"The court rejects the executor's request to use the appraised value, as the lease creates greater value to the decedent and his successors, than that of the present fair market value; without the lease, the court would have used appraised value. There was no evidence presented to suggest that the terms of the lease would not be complied with and the court believes the amounts contracted to be paid, would in fact be paid, thus creating a different and higher value than fair market value. The fact that there may exist environmental contamination associated with the property does not impact the contractual obligation to pay the terms of the lease, and in light of the profitability and appraised value of Midland, these concerns did not impact on the court[']s beliefs and findings.

"Further as the lease creates two obligations to pay the decedent and his successors, the court accepts the arguments of the surviving spouse that the court should bifurcate its approach to the value of the real estate in St. Louis, and thus finds the value of the lease is $315,074.30 and the value of the 'put right' at $358,521.36.

"The total value of the St. Louis real estate is $673,595.66, to be added to the [K.S.A.] 59-6a204 net probate estate."

At the outset, we agree with the district court that Lawrence's appraisal must be rejected. The appraisal states that "[t]he property is reportedly involved in a corporate lease, and this lease is not considered to be arms length and it was not considered in the valuation of the property." This statement conflicted with the court's findings that "the lease agreement was in full force and effect on the date of decedent death, and remains so today" and that "[t]here was no evidence presented to suggest that the terms of the lease would not be complied with."

Given these fact-findings, together with the significant remaining term of the lease, the viability of the tenant, and the provision requiring purchase at termination, it simply defies logic to disregard the lease's impact on the value of this property. (We note that the appraiser's failure to analyze the effect on value of the terms and conditions of the lease may also violate generally accepted appraisal practice. See Appraisal Standards Board, Uniform Standards of Professional Appraisal Practice, Standards Rule 1-4(d) [2001 ed.]). We view the district court's criticism of the appraisal

and the court's refusal to adopt or further consider Lawrence's appraisal conclusion as grounded in a credibility determination, and we decline to disturb the court's conclusion in this regard. See *Oshman*, 275 Kan. at 775.

Even more problematic, however, is Maryam's reliance on the 26 U.S.C. § 7520 (2000) rate for purposes of capitalizing revenue streams and discounting terminal purchase price under the MRI lease. We agree with authorities cited by Lawrence regarding the impropriety of employing the § 7520 rate for these purposes. For example, the tax court has stated:

"A leasehold interest is the product of an agreement providing for a lessor to receive payment for a lessees's use of property. Valuation of the resultant payment stream typically relies upon an income capitalization approach to discount the rental installments to present value. Factors considered in calculating an appropriate capitalization rate include the nature of the property, the positive and negative physical attributes of the property, the term of the lease, the market rate for rent for similar properties, and any risk factors that could affect receipt of payments." *Estate of Gribauskas v. Commissioner*, 116 T.C. 142, 153 (2001), *rev'd on other grounds* 342 F.3d 85 (2d Cir. 2003).

Although we agree that the terms and conditions of the MRI lease were crucial to an accurate valuation of the Missouri realty, we are unable to determine the propriety of the district court's decision to apply the § 7520 rate for purposes of capitalizing the income stream or discounting the terminal purchase value. In fact, the record and the court's journal entries are devoid of the detailed calculations, making it impossible for us to provide meaningful appellate review. See *Burch v. Dodge*, 4 Kan. App. 2d 503, 506-07, 608 P.2d 1032 (1980).

We conclude that neither party to the proceeding provided substantial competent evidence of the value of the Missouri realty and that the court's adoption of Maryam's approach to valuation is not sufficiently supported or detailed for appellate review. For all these reasons, we are compelled to reverse the district court's valuation of the Missouri realty and remand for further proceedings to determine the fair market value of this property at the date of Norman's death with due regard for all terms and conditions of the MRI lease.

### *Did the District Court Err in Awarding Executor and Attorney Fees and Costs?*

The final issue in this appeal is Maryam's challenge to the district court's award of executor and attorney fees and costs. Generally she contends that the fees were either inadequately documented, unreasonable, or inappropriate in light of Lawrence and his attorneys' performance of duties unrelated to the interests of the estate.

At the posttrial motions hearing, the parties extensively litigated the propriety of this award. Lawrence testified in some detail about the various duties he performed on behalf of both the estate and the Trust as well as the impact those duties had on his personal and professional life. Additionally, Lawrence testified about his numerous trips to Kansas that were associated with the administration of the estate; for support, Lawrence submitted a copy of his counsel's itemized billing record with the dates of Lawrence's participation highlighted. The court also admitted a document into evidence estimating from the information contained in the billing record that Lawrence spent 197.6 hours providing services as executor through July 31, 2003. Lawrence conceded, however, that he did not keep a log of the time he spent performing estate or trust duties. Lawrence testified he arrived at his requested sum of $100,000 by estimating both that the estate administration would wrap up by the end of December 2003 and that his services were worth approximately $33,000 per year. When asked whether he believed the sum of $100,000 represented fair compensation for the duties he performed as executor, Lawrence responded, "I think it's a bargain."

In contrast to the documentation for executor fees, the attorney fee request was supported by a 57-page detailed billing, reflecting date of service, timekeeper, hours spent, rate, and detailed description of services provided. The hourly rates of timekeepers servicing the estate ranged from $45 (presumably paralegal services) to $180.

The district court's comments from the bench illuminate its rationale for the fee awards. With regard to the executor fee, the court stated:

"[Lawrence] has a lot of responsibilities and spent a lot of time and the Court believes that, while [Maryam's counsel] has pointed out that, you know, trying to

account for hours he has failed to do, but I'm not expecting of that, I really think the Court looks at the overall position that he was placed into, the trust he was given by [Norman], the responsibilities given to him, I think he has earned a fee of; $100,000 is warranted under the circumstances. . . . Well I'm not going to try to suggest that I am basing this on x-number of hours that he spent on it, I just know that he spent an awful lot of time, that he was invested with a lot of responsibility and that should be compensated and when you consider the length of time these proceedings have gone, the complexity of the issues, the involvement he had obviously with the number of hours he spent dealing with lawyers, accountants, appraisers, etcetera, travel; the court believes he is justified not by any percentage, not by any hourly rate, but just by the overall complexity, time spent and responsibility level."

With regard to attorney fees and costs, the court stated:

"[T]he Court believes that even while there may have been some blending and some overage and overlapping, the Court still believes that the fee is not unconscionable, the request and that it is in all or in part related to the estate and therefore, the court denies the request to reduce the fee as [Maryam's counsel] has suggested."

Again, the crux of Maryam's argument is that the district court erred in awarding the requested executor and attorney fees because the services rendered were not confined to the administration of the estate. For support, Maryam correctly states that an allowance of fees is inappropriate when a party pursues litigation for his or her personal benefit rather than for that of the estate and is unsuccessful in those endeavors. See *In re Estate of Somers*, 277 Kan. 761, 773, 89 P.3d 898 (2004); *Householter v. Householter*, 160 Kan. 614, Syl. ¶ 2, 164 P.2d 101 (1945).

Pursuant to the probate code, every fiduciary is "allowed his or her necessary expenses incurred in the execution of his or her trust, and shall have such compensation for services and those of his or her attorneys as shall be just and reasonable." K.S.A. 59-1717. An executor qualifies as a fiduciary of the probate estate. K.S.A. 59-102(2) and (3); *In re Estate of Petesch*, 31 Kan. App. 2d 241, 244, 62 P.3d 674 (2003). Accordingly, an executor owes a duty to the estate as a whole rather than to each individual heir. 31 Kan. App. 2d at 244. In allowing an executor's claim for compensation, a district court must find that the services rendered were reasonably necessary for the proper administration of the estate. 31 Kan. App.

2d at 244-45. "Services provided or expenses incurred *solely to* benefit one or more of the heirs or beneficiaries to the detriment of or without any benefit to the estate are not properly compensable or reimbursable from the estate assets." (Emphasis added.) 31 Kan. App. 2d at 245.

Mindful that we review these awards for an abuse of discretion, we simply cannot conclude that either the executor fee or the attorney fees were unreasonable. The record demonstrates Lawrence spent a considerable amount of time in the past 5 years tending to matters involved in the administration of Norman's estate. Although Lawrence performed services in various capacities, one cannot conclude he provided those services *"solely* to benefit one or more of the heirs or beneficiaries to the detriment of or *without any benefit to the estate."* (Emphasis added.) *Petesch,* 31 Kan. App. 2d at 245. Moreover, even if one could establish that *some* of the efforts were *more* beneficial to Lawrence or the Trust than to the estate, the parties have not proposed and we decline to require any precise formula that would accurately segregate, allocate, or otherwise treat differently such services from those performed exclusively for the estate.

We specifically reject Maryam's suggestion that all fees be prorated based upon the amount and source of assets ultimately included in the augmented estate, because the raw dollar value of an asset is no reliable measure of services that were reasonably necessary to properly administer that asset.

Given both the complex circumstances involving the administration of Norman's estate and the nature of the duties imposed upon Lawrence, the district court's view of services performed by the executor and his attorneys was reasonable. To this end, Maryam's arguments on appeal are troubling, in that they appear to disregard the inherent overlap in duties imposed upon Lawrence. Moreover, she casts a negative shadow over Lawrence's decision, as executor, to defend the estate against her spousal election claim, characterizing Lawrence's actions as having been "done in an effort to advance the interests of recipients of non-probate transfers from the decedent." Although, undoubtedly, this probate matter became contentious, Maryam's characterization of Lawrence's underlying

intentions in defending against her election claim is unsubstantiated in the record.

From a review of the extensive record, and based on the district court's reasonable characterization of the nature of services performed, we conclude the district court did not abuse its discretion in awarding and deducting from the probate estate the executor fee, attorney fees, costs, and expenses pursuant to K.S.A. 59-6a204.

### Summary and Conclusion

The district court is to be commended for an overall fair and insightful resolution of complex factual and legal issues presented by this probate matter. We affirm the district court's conclusions regarding the valuation and inclusion in the augmented estate of Lawrence's HFLP interest, Norman's life estate in the Nebraska realty, and the awards of executor and attorney fees, costs, and expenses. We reverse only the district court's valuation of the Missouri realty and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings with directions.