No. 93,470

In the ESTATE OF NORMAN B. HJERSTED, Deceased.

(175 P.3d 810)

Opinion filed February 1, 2008.

*Michael R. Ong,* of Law Office of Michael Ong, P.A., of Leawood, argued the cause, and *Michelle M. Burge,* of the same firm, was with him on the briefs for appellant.

*Terrence J. Campbell,* of Barber Emerson L.C., of Lawrence, argued the cause, and *Byron E. Springer, William N. Fleming,* and *Cheryl L. Trenholm,* of the same firm, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: This case concerns a dispute between a widow, Maryam Hjersted, and her stepson, Lawrence Hjersted, over the value of her spousal elective share of her deceased husband's estate under K.S.A. 59-6a201 *et seq*. There is no dispute about the percentage share to which she is entitled. The parties simply disagree on the value of two particular assets transferred to Lawrence within 2 years of the death of Maryam's husband, Norman: (1) Norman's interest in the family limited partnership and (2) Norman's life estate in Nebraska farmland which was sold. Our jurisdiction is pursuant to K.S.A. 20-3018.

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in determining the value of Norman's family limited partnership interest that he transferred to Lawrence? Yes.

2. Did the district court err in determining the value of Norman's life estate interest in proceeds from the sale of the Nebraska farmland? No.

Accordingly, we reverse the decision of the district court and the Court of Appeals on Issue 1 and remand with directions. We affirm the decision of the district court and the Court of Appeals on Issue 2.

## FACTS

Norman B. Hjersted (Norman) and his wife, Maryam, were married in June 1981. Together they had a son, Timothy, and Norman

had three children from a prior marriage: Lawrence, Karen, and Ingrid. Since its incorporation in 1981, Norman had totally owned a closely held company called Midland Resources, Inc., (MRI) that manufactures chemicals used in the treatment of water and waste-water.

*The Hjersted Family Limited Partnership and Norman's revocable trust*

On February 20, 1997, Norman and Lawrence created the Hjersted Family Limited Partnership (HFLP). Norman transferred all (500) shares of MRI to the HFLP; these shares were the only asset of the limited partnership. Norman kept 96% of the limited partnership interest in HFLP for himself. The remaining HFLP interests were owned as follows: 2% general partnership owned by Norman, 1% general partnership owned by Lawrence, and the last 1% of the limited partnership interest in HFLP owned by Lawrence. They purchased their interests through delivery of cash and promissory notes. Section 1.4 describes the "Character of Business" as:

"The Partnership's purpose is to facilitate communication among family members in connection with business matters, to reduce costs associated with the disability of any of the partners, to preserve family control of Partnership assets, and the conduct of any other business which shall be legal for a limited partnership to conduct in Kansas."

Sixteen months later on June 8, 1998, Norman created the Norman B. Hjersted Revocable Trust and named himself trustee. The same day, he executed his "Last Will and Testament." The will "poured over" probate assets into the trust.

Fifteen months after the creation of Norman's revocable trust, on September 10, 1999, Norman transferred to his trust his 96% limited partnership interest and his 2% general partnership interest in HFLP. Other assets not relevant to this appeal also were transferred.

*Gift/sale transaction*

Approximately 3 years after the creation of HFLP, on March 1, 2000, Norman entered into a gift/sale transaction with Lawrence

concerning his 96% limited partnership interest in HFLP. $675,000 worth of Norman's 96% interest—the maximum allowable without incurring federal gift tax—was gifted to Lawrence. According to their contract, the balance of Norman's 96% interest was sold at a price to be determined by later appraisal. Norman retained his 2% general partnership interest as contained in his revocable trust for which he served as trustee.

Norman's and Lawrence's appraiser, John Korschot, of Stern Brothers Valuation Advisors (Stern Brothers), testified at the later trial that in May 2000 he was tasked with determining the fair market value of a nonmarketable limited partnership. Korschot first valued the HFLP's only asset, the 500 shares of MRI stock, at $4500/share, for a total of $2.25 million. This result was reached after applying a "lack of marketability" discount of 20%.

Because the MRI stock was also contained within HFLP, a limited partnership, Korschot applied a discount of 10% for lack of control and an additional 25% discount for lack of marketability, resulting in a combined effective discount of 32.5% for the limited partnership value. In response to a question by the district court, Korschot testified that he was not "double discounting." He described the basis for the discounts: "a Limited Partner has few, if any rights in the affairs in the Partnership, compared to the General Partner [so] a discount for lack of control of the Limited Partnership should be considered. Also, a discount for the lack of marketability should be considered, since there is no readily available market for the Limited Partnership interest." According to Korschot, the fair market value of the transferred 96% limited partnership interest in HFLP was the net asset value of MRI ($2.25 million) times the percentage of limited partnership interest transferred (96%), reduced by the additional discounts (32.5%), for a total of $1,458,000.

Because $675,000 of the $1,458,000 was transferred to Lawrence by gift, Korschot's appraisal meant that Lawrence owed Norman a balance of $783,064. Of this amount, Lawrence paid 5% ($39,150) and signed a promissory note for the remaining $743,914.

On May 18, 2000, approximately 2½ months after the gift/sale transaction, Norman executed a new trust agreement, which amended and restated the prior trust agreement. The new agreement included provisions for the disposition of Norman's property both before and after his death. Norman remained trustee, and Lawrence was named successor trustee. Lawrence later stepped in as trustee in late 2000 or early 2001 because Norman's stroke at that time left him in a coma for 10 days.

*Nebraska farmland*

Norman owned a life estate in certain farmland in Richardson County, Nebraska, and Lawrence owned the remainder interest. In September 1999, under purported threat of condemnation, the property was deeded to the United States Army Corps of Engineers for $292,950. The price included both the life estate and the remainder interest, but the entire proceeds were deposited into Lawrence's bank account. Lawrence later contributed those proceeds toward the purchase of a Florida orange grove as a like-kind investment. At the time of this purchase, Norman wrote to Lawrence: "It is my intent and has always been that you retain ownership of the Florida Farm. I would like and need some of the profits but not to exceed 5% / year of value of money received from the Corp. of Engineers."

*Norman's death and subsequent events*

On April 28, 2001, approximately 13 months after the gift/sale transaction, Norman died. Among the assets remaining in his revocable trust at that time was his 2% general partnership interest in HFLP.

In August 2001, rather than take what was provided for her under Norman's will, Maryam filed a petition for elective share of surviving spouse, requesting the court to determine her elective share of the couple's augmented estate pursuant to K.S.A. 59-6a201 *et seq.* Thereafter, the district court admitted Norman's will into probate and appointed Lawrence executor of the estate. As executor, Lawrence filed a proposed calculation of Maryam's unsatisfied elective share. However, the parties did not agree on the

valuation and treatment of all of the property, particularly the gift/sale transaction and the life estate in the Nebraska farmland. A trial therefore occurred on June 16 through 19, 2003.

During the trial, both Korschot and an appraiser retained by Maryam, Timothy Meinhart, of Willamette Management Associates ("WMA"), testified. Meinhart testified about his appraisal report dated June 11, 2003, in which he had determined the "fair market value" of the common stock of MRI as of March 1, 2000. He admitted that he was neither asked to, nor did, consider the value of the MRI stock as contained within HFLP, a limited partnership. He determined that the value of the MRI 500 shares of stock was $2.66 million, which included a 10% discount for its lack of marketability, presumably as a closely held corporation. Accordingly, he calculated that the value of Norman's 96% of the $2.66 million of MRI stock was $2,553,600.

Based upon the parties' competing experts, and the down payment and promissory note amounts of the March 2000 gift/sale transaction, the parties' financial arguments were essentially as follows:

### Maryam's Calculations

| | |
|---|---|
| Value of MRI (@ 10% discount) | $2,660,000 |
| Value of Norman's 96% MRI interest | $2,553,600 |
| Consideration Paid by Promissory Note | ($ 743,914) |
| Consideration Paid at Closing | ($ 39,150) |
| Net Uncompensated Transfer to be added to augmented estate | $ 1,770,536 |

### Lawrence's Calculations

| | |
|---|---|
| Value of MRI (@ 20% discount) | $2,250,000 |
| Value of Norman's 96% MRI interest | $2,160,000 |
| Discount for HFLP (32.5%) (adjusted) | ($ 701,936) |
| Consideration Paid by Promissory Note | ($ 743,914) |

Consideration Paid at Closing       ($    39,150)
Net Uncompensated Transfer to be added to
augmented estate                                     $ 675,000

Of the approximate $1.1 million difference in value, $393,000 was attributable to the difference in values attached to the MRI stock by the competing experts and $701,936 was attributable to Korschot's "second layer" of discounts, *i.e.*, in the HFLP.

On July 12, 2004, the district court issued its 15-page memorandum decision. Among other things, the court found that Meinhart's opinion of the MRI stock value of $2.66 million was "better supported" than Korschot's.

"16.g: That after analysis of the written reports submitted by both experts and weighing the testimony provided by both experts, that the opinion of Meinhart is better supported (in particular with regard to use of more recent data concerning the increase in pretax income in early 2000, the on sight investigation, and the inherent bias to minimize value by Korschot in performing the task hired for), and the court finds that the value of 500 shares of Midland Resources Inc. to be $2,660,000."

The district court also found that the partnership was organized for valid family and business purposes; that Lawrence was the heir apparent of Norman's business; that Norman had an estate planning and business objective to pass the family business to his son; and that HFLP "was a valid and existing limited partnership at the time of the gift on March 1st, 2000 and continues to be so." However, because Maryam did not consent to the transfer, the court found that the full value of the limited partnership interest, *i.e.*, without Korschot's 32.5% discounts for marketability and control, must be included in the augmented estate. It adopted Maryam's calculations for calculating the uncompensated transfer at $1,770,536 (then later agreed with Lawrence that K.S.A. 59-6a205[c][3] required the court to reduce the amount of the uncompensated transfer by $10,000, to $1,760,536).

The district court also concluded that the value of Norman's life estate in the Nebraska farmland—which sold for $292,950—was $137,394. Coupled with its value of the uncompensated transfer of MRI stock, it concluded that those two nonprobate transfers to be added to the augmented estate totaled $1,907,930.

In determining the augmented estate, the court added (1) the net probate estate of $1,754,089, (2) the values of the two nonprobate transfers of $1,907,930, (3) Norman's nonprobate transfers to Maryam of $241,370, and (4) Maryam's assets of $857,475, for an augmented estate total of $4,760,863. After calculating Maryam's entitlement at 50% of the augmented estate based on the length of her marriage to Norman, and then deducting her assets and Norman's nonprobate transfers to her, the court found that Maryam's unsatisfied elective share was worth $1,281,587.

After Lawrence's motion for reconsideration, the court later modified its prior judgment. Among other things, the court decreased the probate estate to $1,363,208, decreased the total net probate estate to $1,551,558, decreased the value of Norman's nonprobate transfers to others by $10,000 because of the federal exemption for a gift in 1 year, and now valued the augmented estate at $4,548,333. Based on the modified numbers, the court reduced Maryam's unsatisfied elective share from $1,281,587 to $1,175,322.

Both parties filed timely notices of appeal on numerous grounds. The Court of Appeals first provided an overview of the Kansas spousal elective share statutes:

"In 1994, the Kansas Legislature amended the Kansas Probate Code to incorporate a comprehensive spousal elective share scheme patterned after the Uniform Probate Code. See K.S.A. 59-6a201 *et seq*. The statutory scheme gave the surviving spouse the right to take an elective share amount equal to the value of an elective share percentage of the augmented estate, the percentage determined by a statutory table based on length of the marriage. K.S.A. 59-6a202. For purposes of determining the augmented estate, certain uncompensated nonprobate transfers to others are included, including certain of those during the 2-year period next preceding the decedent's death. K.S.A. 59-6a205 and K.S.A. 59-6a207.

. . . .

"In a situation such as that presented here, upon the election by a surviving spouse, the statutory scheme requires analysis of nonprobate transfers to determine whether assets should be 'pulled back' or included in the augmented estate, together with valuation of those assets at date of transfer. K.S.A. 59-6a205 to K.S.A. 59-6a208. Once the augmented estate has been composed generally from the net probate estate and the eligible uncompensated nonprobate transfers, the surviving spouse is entitled to the elective share percentage shown in the statutory table. K.S.A. 59-6a202 to K.S.A. 59-6a203. Award of fees and other administrative expenses reduce the augmented estate for these purposes. K.S.A. 59-6a204." *In re Estate of Hjersted,* 35 Kan. App. 2d 778, 782-83, 135 P.3d 202 (2006).

Regarding the only two issues now before this court on Lawrence's petition for review, the Court of Appeals held that the district court erred in focusing on Maryam's lack of consent in determining whether discounts purportedly inherent in limited partnership interests should be applied in the valuation process. It correctly held that the value of the 96% limited partnership interest in HFLP on March 1, 2000, must be included in the augmented estate to the extent it was not supported by consideration. It further held that on the question of value of this interest, the district court's adoption of Meinhart's evaluation of the MRI stock at $2.66 million was supported by substantial competent evidence.

The Court of Appeals acknowledged that the district court had a "misfocus" on the value of the MRI stock rather than the limited partnership interest, which could be error because it disregarded discounts for lack of control and marketability purportedly inherent in the fact that the stock was held in a limited partnership. 35 Kan. App. 2d at 787. Nevertheless, the court proceeded to hold that

"[d]iscounts for lack of control and lack of marketability were unnecessary under these circumstances for several reasons:

"• Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of such holdings. *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1145 (Del. 1989);

"• Control and marketability discounts are not appropriate when the purchaser is either the majority shareholder or the corporation itself. *Arnaud v. Stockgrowers State Bank,* 268 Kan. 163, Syl. ¶ 3, 992 P.2d 216 (1999). Similarly, when the result of the transaction unifies the interests of a partnership in the same individual [Lawrence], albeit as an individual and a trustee, such discounting is illusory;

"• Where the sole asset of the partnership is corporate stock that has already been discounted for lack of marketability, no further discount is appropriate when valuing the partnership interests because the partnership did not perform a management function for such asset. See *Estate of Bongard v. Commissioner,* 124 T.C. 95, 126-29 (2005) (transfer of stock to a limited partnership does not satisfy bona fide sale exception to 26 U.S.C. § 2036[a] [2000]);

"• Where, as here, the artificiality or illusory nature of the partnership entity is manifest by its disregard in practice, including illusory capital contributions, lack of any filing of state or federal partnership tax returns, MRI dividends paid directly to Lawrence and Norman rather than the entity, and charter forfeiture by the State, the separate legal existence of the partnership entity at death does not require discounting that might otherwise be appropriate in valuing partnership interests. See *Estate of Thompson v. C.I.R.,* 382 F.3d 367 (3d Cir. 2004); *Estate*

*of Reichardt v. Commissioner,* 114 T.C. 144 (2000); *Estate of Morton B. Harper,* 83 T.C.M. (CCH) 1641 (2002); *Estate of Dorothy Morganson Schauerhamer,* 73 T.C.M. (CCH) 2855 (1997) (all of which hold that where a decedent's relationship to transferred assets remains the same before and after transfer, the assets transferred are returned to gross estate for estate tax purposes).

"● Recognition of discounting under these circumstances could encourage the creation of layers of illusory ownership for nonprobate transfers, each with the potential for additional discounting, and all for the purpose of insulating the true value of assets transferred, in furtherance of a scheme to disinherit a spouse. Such encouragement would be counter to the legislative purpose of the Kansas spousal elective share statutes. See *In re Estate of Antonopoulos,* 268 Kan. 178, 181-82, 993 P.2d 637 (1999); *Ackers v. First National Bank of Topeka,* 192 Kan. 319, 332-33, 387 P.2d 840 (1963)." 35 Kan. App. 2d at 787-89.

Accordingly, the court affirmed the district court's valuation of the transfer and the resulting addition of $1,760,536 to the augmented estate.

Regarding the second issue for which this court later accepted review, the Court of Appeals also affirmed the district court's inclusion in the augmented estate of the life estate interest in the Nebraska farmland because the life tenant, Norman, and the remainderman, Lawrence, united in a nonjudicial sale of the property. 35 Kan. App. 2d at 791-92.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The district court erred in determining the value of Norman's family limited partnership interest that he transferred to Lawrence.*

Lawrence argues that the Court of Appeals erred in affirming the district court's valuation, explaining:

"[T]he value of the 96% limited interest in HFLP that Norman transferred to Lawrence is one of the key issues in this appeal because the Kansas Spousal Elective Share statute 'pulls back' the value of Norman's gift to Lawrence as an addition to the augmented estate. See K.S.A. 59-6a205(c) (augmented estate includes value of gifts made within two years prior to death). To the extent this litigation ultimately determines that the value of the 96% limited partnership interest in HFLP is greater than the amount of Norman's gift [$675,000] plus Lawrence's payment [$783,064 in cash and note], the additional value constitutes an additional gift which must be included in the augmented estate. *One of the key determining factors in the value of the 96% limited interest in HFLP is whether*

*to apply the 32.5% valuation discount for lack of control and lack of marketability.*" (Emphasis added.)

As we have explained, a minority discount allows an appraiser to adjust for a "lack of control" over the entity on the theory that the minority interests are not worth the same as the majority interests due to the lack of voting power. A marketability discount allows an appraiser to adjust for a "lack of liquidity" in the interest itself on the theory that there is a limited supply of purchasers of that interest. See *Arnaud v. Stockgrowers State Bank,* 268 Kan. 163, 165, 992 P.2d 216 (1999) (citing Hood *et al., Valuation of Closely Held Business Interests,* 65 UMKC L. Rev. 399, 438 [1997]).

The Court of Appeals refined the salient issue: the value of the 96% HFLP interest on March 1, 2000. Generally, the determination of property value has been a question of fact. See *Board of Johnson County Comm'rs v. Smith,* 280 Kan. 588, 597, 123 P.3d 1271 (2005) (condemned property's fair market value is jury question); *Hotchkiss v. Fischer,* 139 Kan. 333, 31 P.2d 37 (1934) (value of stock in closely held corporation is jury question). The determination of asset value concerning the augmented estate, as in the case at bar, was a question of fact for the district court in *In re Estate of Antonopoulos,* 268 Kan. 178, 190-92, 993 P.2d 637 (1999) (issue of value of properties in joint tenancy and of value of homestead remanded to district court for determination). Indeed the district court here included as one of its findings of fact a determination that the value of the 500 shares of MRI stock was $2,660,000.

The Court of Appeals ruled that substantial competent evidence supported this district court determination of MRI value. See *U.S.D. No. 233 v. Kansas Ass'n of American Educators,* 275 Kan. 313, 318, 64 P.3d 372 (2003) (substantial evidence is evidence possessing both relevance and substance which furnishes a substantial basis of fact from which the issues can reasonably be resolved). Inherent in the Court of Appeals' use of this standard of review is an acknowledgment that valuation is a question of fact. Indeed, it earlier stated: "To the extent that the district court made fact findings, *particularly as they regard valuation issues,* we review those

findings to determine whether they are supported by substantial competent evidence." (Emphasis added.) 35 Kan. App. 2d at 784. As a result, the Court of Appeals further acknowledged that "we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 35 Kan. App. 2d at 784.

After the district court's adoption of Meinhart's valuation of MRI stock, it essentially declined to analyze Korschot's additional discounts for lack of control and marketability which were based upon the MRI stock's containment within the HFLP. It instead rejected these discounts simply because "the surviving spouse did not consent to this transfer." The Court of Appeals correctly determined that rejection on the consent basis was error because under K.S.A. 59-6a205 and K.S.A. 59-6a207, consent is irrelevant.

Although the Court of Appeals reviewed the district court's MRI valuation finding based upon Meinhart's opinion as a question of fact, it then proceeded to reject the Korschot additional discounts because they were "unnecessary under these circumstances." 35 Kan. App. 2d at 787. While the court did not articulate its standard in arriving at this determination, its analysis reveals a de novo review and resultant legal conclusion. However, it did not similarly review Meinhart's admitted use of a 10% lack of marketability discount as a matter of law, but apparently embraced the propriety of his discount within the "factual" determination.

As analyzed below, the Court of Appeals was incorrect in establishing several legal reasons for total rejection of Korschot's additional discounts "under these circumstances" as an alternate basis for affirming the district court.

Among other things, one of the Court of Appeals' ostensible legal reasons—the "artificiality or illusory nature of the partnership entity"—was apparently based upon that court's independent determination of facts after reviewing evidence in the record. The facts highlighted by the Court of Appeals, e.g., a lack of filing of state or federal partnerships tax returns, are inconsistent with findings made by the district court. These findings include the trial court's express determination that HFLP was organized for valid family and business purposes, that Lawrence was the heir apparent of Norman's business, and accordingly that Norman had an estate

planning and business objective to pass the family business to his son.

As mentioned, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. *Evenson Trucking Co. v. Aranda,* 280 Kan. 821, 837, 127 P.3d 292 (2006). Our deferential review of the record reveals that substantial competent evidence supports these district court findings. Norman and Maryam's attorney at the time the HFLP was created in 1997, Denver Vold, testified that the purpose of the HFLP was: (1) to shield Norman's assets from a potential claim related to environmental litigation, (2) to shield assets from business creditors, (3) for estate planning and business succession purposes—so that Lawrence would receive all of his interests in his closely held businesses and manage the company, and (4) to reduce taxes by reducing the value of Norman's estate. Vold further testified that although a merger had been contemplated by Norman and Lawrence of their various enterprises, they decided to first form the HFLP, because of the possibility that through merger Norman's estate taxes would increase as a result of the increase in the value of Lawrence's business.

These district court findings in turn partially supported its determination in its July 12, 2004, journal entry: "The court finds that the partnership was a valid and existing limited partnership *at the time of the gift on March 1st 2000 and continues to be so.*" (Emphasis added.) This determination impliedly rejected Maryam's argument, acknowledged by the court in its finding that "the surviving spouse . . . counters that the family partnership was not properly created or properly maintained and thus a discount is not applicable." Accordingly, the Court of Appeals was incorrect in weighing conflicting evidence and in relying upon the purported artificiality or illusory nature of the HFLP to conclude that Korschot's discounts were unnecessary.

Another reason given by the Court of Appeals for totally rejecting Korschot's additional discounts as unnecessary was its belief that discounting individual share holdings injects into the appraisal

process speculation on the various factors which may dictate the marketability of such holdings. 35 Kan. App. 2d at 787. However, the Court of Appeals itself previously accepted such alleged speculation-based marketability discounting in this case. It had already supported the district court's adoption of Meinhart's appraisal which applied a 10% marketability discount when determining the value of Norman's 96% individual holding in MRI: $2,553,600. Accordingly, we cannot agree with the Court of Appeals' rejection of Korschot's additional discounts on this basis. Other grounds for our rejection of the Court of Appeals' "legal" reasons will be addressed later in the opinion while discussing other issues.

Moreover, with the Court of Appeals' absolute rejection, as a matter of law, of Korschot's additional discounts, the court effectively eliminated the only evidence in the record on the value of the transferred 96% limited partnership interest in HFLP on March 1, 2000, which value that court itself described as "the paramount consideration." 35 Kan. App. 2d at 786. As mentioned, Meinhart freely admitted that he did not value the HFLP interest: only its sole asset, the MRI stock. Consequently, the Court of Appeals' decision ultimately made case-dispositive a valuation that made no pretense of addressing that court's paramount issue: value of the HFLP limited partnership interest on March 1, 2000.

We conclude that the valuation of the 96% HFLP interest on March 1, 2000, is best left to the district court. See *In re Estate of Antonopoulos*, 268 Kan. 178, 187, 993 P.2d 637 (1999) (after holding that district court erred in failing to include joint tenancy property in augmented estate, this court rejected spouse's request for it to compute value of her elective share, noting disputed facts as to value of properties to be included). Accordingly, the case is reversed and remanded to the district court. The court will be required to at least address the validity of Korschot's 32.5% discounts for lack of marketability and lack of control of HFLP interests, and may adjust, compromise, or even reject one or both. As several commentators have expressed when valuing closely held business interests, including limited partnerships:

"Opinions as to value frequently are far apart especially when such opinions are requested by adversaries. In the final analysis, the outcome of each case is usually

a compromise, with the Court often finding a value somewhere between the valuation sought by the taxpayer and the higher appraisal sought by the Service. Since the facts of each case will determine the outcome, it is worth noting that case law is usually available to support any position regarding valuation of an interest in a closely held business." Hood, *et al.*, *Valuation of Closely Held Business Interests*, 65 UMKC L. Rev. 399, 406-07 (1997) (reference work cited with approval in *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 165, 992 P.2d 216 [1999]).

Indeed, in *Bohl v. Bohl*, 232 Kan. 557, 657 P.2d 1106 (1983), the district court was required to value the stock in a closely held corporation for property division in divorce proceedings. After considering the wife's expert's valuation of $4,018,297 and the husband's expert's valuation of $993,635, the district court determined the value was $2,066,463, which this court affirmed as "well within the evidence and will not be disturbed." 232 Kan. at 565.

We cannot prognosticate all the factors that the district court could decide to consider in this value determination on remand. What follows is not offered to suggest, much less direct, a particular outcome regarding any of the topics discussed. Rather, it is offered to suggest some general contours of guidance which the district court may decide to consider, or not to consider, at its discretion.

Estate and Gift Tax Contexts

As mentioned, the district court made supported findings that the partnership was organized for valid family and business purposes; that Lawrence was the heir apparent of Norman's business; and accordingly that Norman had an estate planning and business objective to pass the family business to his son. These findings in turn partially support the court's determination that the partnership was a valid and existing limited partnership at the time of the gift on March 1st, 2000, and continued to be so at the time of its ruling in July 2004. This determination impliedly rejected Maryam's argument that the family partnership was not properly created or properly maintained and thus a discount was not applicable.

On remand, the district court may possibly determine from these prior rulings that—contrary to the Court of Appeals' belief that "[a]t some time before his death, Norman apparently visited his attorneys and expressed a desire to disinherit his wife" (35 Kan.

App. 2d at 781)—Norman's HFLP transfers instead were manifestations of his estate planning and business objective to pass the family business to Lawrence. As mentioned, attorney Vold essentially testified to this effect. Moreover, as Lawrence points out, Maryam herself had some involvement in the gift/sale. Lawrence testified, without contradiction, that she not only attended the transaction, but she was also the one who suggested that he buy Norman's HFLP interest over a 30-year period instead of 10 years because she wanted income for a longer period of time.

Should the district court determine that Norman's transfers indeed represented legitimate estate and business planning, or at least did not represent a desire to disinherit Maryam, it may also consider that, without more, discounts for lack of control and lack of marketability can appropriately be applied to interests in family limited partnerships. See Jensen, *The Magic of Disappearing Wealth Revisited: Using Family Limited Partnerships to Reduce Estate and Gift Tax*, 1 Pitt. Tax Rev. 155 (2004); Hood, *et al.*, *Valuation of Closely Held Business Interests*, 65 UMKC L. Rev. 399 (1997). As the title of the Pittsburgh Tax Review article suggests, discounts through the use of family limited partnerships are often applied in an effort to reduce estate and gift taxes, *i.e.*, in dealings with the IRS. The article describes the taxpayers' goal as reverse alchemy: "to reduce the value of their property" for tax purposes. 1 Pitt. Tax Rev. at 155. Indeed, "the discount partnership" was described in 1997 as the "most recent innovation" to reduce transfer taxes, *i.e.*, estate, gift, and generation-skipping taxes. See Blatt, *Minority Discounts, Fair Market Value, and the Culture of Estate Taxation*, 52 Tax L. Rev. 225, 226 (Winter 1997).

As the Pittsburgh Tax Review article's author discusses how to use the family limited partnership to reduce estate and gift taxes, he provides examples that are factually similar to the instant case. He explains that frequently a taxpayer will

"transfer the assets she wished to qualify for a discount [to a family limited partnership (FLP)], taking back a general partnership (GP) interest representing a minute portion of the FLP's equity (say, 1%) and limited partnership (LP) interests representing the balance of the FLP's equity (say, 99%). The taxpayer will then embark on a gift program designed to eliminate all of her LP interests at

little or no gift tax cost. Thus, her estate at death will consist of only a GP interest representing a mere one percent of the FLP's equity, [or she may also] give away the GP interest . . . , thereby totally eliminating the FLP from her estate." 1 Pitt. Tax Rev. at 156.

The author explains the tax benefits available through the use of this technique: "[T]he LP interests will be valued for tax purposes at a substantial discount from the value of the underlying assets that they represent. The purported justification for these discounts is that the LP interests lack both control and marketability." 1 Pitt. Tax Rev. at 157.

In language similar to the testimony of Korschot, the author first describes the rationale for the lack of control discount available through the use of this technique:

"State law prohibits the limited partners of an FLP from participating in the management of the business. Consequently, a buyer of an LP interest will be at the mercy of the general partners with respect to all decisions regarding the FLP's operations and earnings (e.g., whether the FLP distributes its earnings to the partners or retains them in the business). Obviously, a buyer will pay less for such an interest than he would for an interest that confers control." 1 Pitt. Tax Rev. at 157.

In Kansas, for example, limited partners must rely on the general partner to make decisions, and their rights to make decisions regarding partnership operations and property is significantly restricted. See K.S.A. 56-1a253(a) (powers of the general partners); K.S.A. 56-1a203 (limitations on control of limited partnerships).

Similarly, in language also reminiscent of Korschot's testimony, the Pittsburgh author next describes the rationale for the lack of marketability discount available through the use of this technique:

"The owner of an LP interest wishing to dispose of that interest cannot sell it simply by telephoning her broker. To sell the interest, the limited partner must locate potential buyers and convince one of them to buy it. This means providing a potential buyer with financial statements and explaining to him the FLP's business, its prospects for the future, its competition, and its management. Since the buyer of the LP interest will have no say in the management of the FLP, he will want to meet the general partner to evaluate his competency and honesty and to determine if the general partner's plans for the business' future are satisfactory. All of this requires time and effort, and time and effort mean money. The rationale for allowing a discount for lack of marketability is that a potential buyer will

discount, that is, pay less for an interest that he cannot readily resell." 1 Pitt. Tax Rev. at 157-58.

The author observes that through the use of the family limited partnership, courts have generally allowed combined discounts for lack of marketability and control ranging from 25% to 35% and sometimes even more. 1 Pitt. Tax Rev. at 155. For example, in *Harwood v. Commissioner*, 82 T.C. 239 (1984), where the family limited partnership transferred certain interests, the United States Tax Court applied discounts totaling 50% for minority interests which were not publicly traded and were subject to transfer-restricting clause in the partnership agreement. The author concludes that "these discounts, when used in conjunction with the gift tax annual exclusion and the gift tax unified credit, can result in very substantial amounts of wealth being transferred" without any liability for estate and gift tax. 1 Pitt. Tax Rev. at 158.

He also notes that the discounts have been allowed for reducing transfer taxes even when the reduction in value is only temporary. The author explains with an example relevant to our facts:

"Suppose P operates a business worth $3,000,000. P transfers the business to a newly formed FLP, takes back a 1% GP interest and 99% LP interests. She gives the 99% LP interests to her son, S. Years later, P dies and in accordance with her long-term plan, bequeaths the 1% GP interest to S. The business is still worth $3,000,000. For purposes of this example, ignore the discount for lack of marketability.

"Under current law, P's gift of the LP interests to S will qualify for a substantial discount because they lack control . . . *However, this* [lack of control] *diminution in the value of the LP interests is merely temporary, since it will cease upon P's death when S receives the 1% GP interest. P will then have full control of the FLP and, assuming no change in the value of the enterprise, will be able to sell the business for $3,000,000: $30,000 for the GP interest and $2,970,000 for the LP interests.*" (Emphasis added.) 1 Pitt. Tax Rev. at 171.

The author explains that by splitting the transfer of the business into two steps—inter vivos transfers of the LP interests and a testamentary transfer of the GP interest—hundreds of thousands of dollars of value will escape the transfer tax through use of the lack of control discount. 1 Pitt. Tax Rev. at 171. The author later illustrates with an example involving a truncated period of transfers:

"A donor may transfer LP interests representing 99% of the FLP's entity to a child, and then in a year following these transfers, transfer the 1% GP interest to the same child. Under current law, 99% of the FLP's equity will qualify for a lack-of-control discount *even though once the donee acquires control, he will be able to sell the LP interests without discount by selling them together with the 1% GP interest.*" (Emphasis added.) 1 Pitt. Tax Rev. at 213-14.

See also generally Harris, *Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts*, 42 Ark. L. Rev. 649, 658-59 (1989) (study documenting *marketability* discounts in the range of 30 to 40% for closely held companies.); see Blatt, *Minority Discounts, Fair Market Value, and the Culture of Estate Taxation*, 52 Tax L. Rev. 225 (1997) (Anecdotal evidence indicates that the size of *minority* discounts have grown over time and that their use has soared.). Indeed, one aspect of a case cited by the Court of Appeals to support its conclusion of the artificiality or illusory nature of the limited partnership, *Estate of Bongard v. Commissioner*, 124 T.C. 95 (2005), supports discounts. There, a decedent transferred his stock in a closely held corporation to a limited liability company. The tax court accepted the parties' stipulations that the value of his interest in the limited liability company was subject to a 13% discount for lack of control and a 17.5% discount for lack of marketability, with certain units additionally subject to a 5% discount for lack of voting rights. 124 T.C. at 132-33.

In short, the district court may possibly find: that the HFLP interest transfers were manifestations of Norman's legitimate business and estate planning; that they would be entitled, at least for transfer tax purposes, to discounts for marketability and control; and that a similar rationale would allow such discounts for valuing those assets in the augmented estate for the spousal elective share purposes.

Kansas dissenting shareholder case law

In *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 992 P.2d 216 (1999), we addressed a corporation's reverse stock split and forced buyout of minority shareholders' stock in order to prevent any fractional share holdings pursuant to K.S.A. 17-6405. Apprais-

ers determined "fair market value," then, after applying minority and marketability discounts, determined the shares' "fair value" under K.S.A. 17-6405.

We noted that cases and commentators suggested that the majority of states have not applied minority and marketability discounts when determining the fair value of stock in similar cases. 268 Kan. at 166. We observed that the American Law Institute was in accord. See 2 A.L.I., Principles of Corporate Governance § 7.22, pp. 314-15. Among the rationales for the refusal to apply the discounts is application would penalize the minority shareholder and unfairly enrich the majority shareholders. We joined the majority of states, answering the specific certified question from the U.S. district court as follows: "that minority and marketability discounts should not be applied when the fractional share resulted from a reverse stock split intended to eliminate a minority shareholder's interest in the corporation." 268 Kan. at 170.

In the district court's determination of HFLP value on remand, it may consider whether Maryam is comparable to a minority shareholder entitled to the undiscounted value of HFLP interests. But it should concurrently consider the caveat contained in Comment e to A.L.I. § 7.22 cited in *Arnaud*:

"The valuation principles adopted by § 7.22 are those that are appropriate for appraisal [of fair value of shares for corporate transactions giving rise to appraisal rights], and *they do not necessarily apply in other contexts, such as the valuation of stock for tax or ERISA purposes. The standard of valuation employed in any given context should reflect the purpose served by the law in that context,* and thus § 7.22 is not intended to imply that in other contexts discounts attributable to minority status or non-marketability are necessarily *in*appropriate." (Emphasis added.)

As part of the district court's calculus, it should also note that it had previously accepted the 10% marketability discount of Meinhart in his valuation of the MRI stock. While not binding on remand, this acceptance is obviously contrary to the outright rejection of the stock discounts in *Arnaud*. Indeed, in a case not involving the specific *Arnaud* situation, this court has held that "control of the stock" is a factor that may be taken into consideration in arriving at the stock's fair market value. *Equity Investors,*

*Inc. v. Academy Ins. Group, Inc.*, 229 Kan. 456, 468, 625 P.2d 466 (1981).

The Court of Appeals actually cited *Arnaud* as support for its decision denying application of Korschot's additional discounts: specifically, for the proposition that control and marketability discounts are not appropriate when the purchaser of the stock is either the majority shareholder or the corporation itself. It then concluded that the entirety of the partnership interests was unified in Lawrence and that when the result of a transaction unifies the interest of a partnership in the same individual, albeit as an individual and a trustee, control and marketability discounts are illusory. 35 Kan. App. 2d at 787.

We disagree with the Court of Appeals' unification conclusion, thus providing another reason for disapproving that court's rejection of Korschot's additional discounts as a matter of law. Accordingly, the district court should not consider the Court of Appeals' conclusion in its determination of value. In reality, the control of HFLP resided with the general partnership, not with the 96% of HFLP owned by Norman and transferred to Lawrence. Norman's 2% general partnership interest—obviously greater than Lawrence's 1%—was transferred to his trust on September 10, 1999, and was there at the time of Norman's death in April 2001. Norman remained trustee until at least late 2000 or early 2001 after his coma when Lawrence stepped in. In short, Lawrence was not the trustee on March 1, 2000, the date of the transfer, and the date acknowledged by the Court of Appeals for valuing the HFLP interests. Accordingly, there was no unification of the partnership interests in Lawrence on the critical date in question. Moreover, even when Lawrence later became trustee, there was no unification of interests in HFLP because until Norman's death, Norman retained the rights to at any time: change the trustee, revoke the trust, and transfer his 2% general partnership interest out of the trust.

## Kansas Spousal Elective Share

As another reason for rejecting Korschot's additional discounts as a matter of law, the Court of Appeals held that creating layers

of illusory ownership and allowing their attendant additional discounting could further a scheme to disinherit a spouse contrary to the legislative purpose of the Kansas spousal elective share statutes. 35 Kan. App. 2d at 788. In general support the court cited *In re Estate of Antonopoulos,* 268 Kan. 178, 181-82, 993 P.2d 637 (1999). There, we acknowledged that "[t]he new elective-share provisions were intended to correct the inequities that resulted under prior law" (268 Kan. at 181) and that "[t]he public purpose of elective-share statutes is to prevent disinheritance of the surviving spouse." 268 Kan. at 183. Consequently, we stated that "[t]o hold that the *intestate* share precludes . . . a surviving spouse from taking an elective share would defeat the intent of the Kansas Legislature to protect against disinheritance." (Emphasis added.) 268 Kan. at 183.

In addition to preventing a surviving spouse's disinheritance, however, is another purpose of the Kansas elective share statutes: to prevent the surviving spouse from needlessly overriding the decedent's legitimate intent to benefit others, *e.g.,* "the greedy electing spouse." See Kuether and Thompson, *The Capricious Operation of the Kansas Elective Share: Feast or Famine for the Surviving Spouse,* 61 J.K.B.A. 32, 37 (Dec. 1992). Accordingly, the authors were concerned about a "feast" for the surviving spouse. See also Item of Interest, *Spousal Elective Share Substantially Changed,* 63 J.K.B.A. 10 (Jun./Jul. 1994) (bill "guards both against disinheriting a surviving spouse and against allowing the spouse to take too much").

Here, based upon previously supported findings, the district court may possibly determine that the HFLP interest transfers represented legitimate steps toward a legitimate estate planning and business objective. Moreover, Vold testified that one of the reasons for forming HFLP was to reduce taxes by reducing the value of Norman's estate. Indeed, $675,000 worth of Norman's 96% interest in HFLP was gifted to Lawrence because that was the maximum amount allowable without incurring federal gift tax. Additionally, appraiser Korschot was retained to value the HFLP interest at the time of transfer, March 1, 2000, and he applied discounts for the reasons he explained: a limited partner has less rights than a general partner in the affairs of the partnership and

there was no readily available market for limited partnership interests. Disallowance of those discounts by the district court could arguably be considered inconsistent with Norman's legitimate intent to benefit his son Lawrence (through substantially reduced taxes) via the HFLP interest transfers.

On the other hand, the district court arguably already recognized the somewhat inconsistent purposes of the spousal elective share and transfer tax reduction. Specifically, it considered the "inherent bias" in Korschot's valuation of MRI—apparently because he wanted to minimize value in order to reduce taxes at the time of the transfer. The court then included this bias as one of its reasons for rejecting Korschot's MRI discount of 20% in favor of Meinhart's discount of 10%:

"Meinhart is better supported (in particular with regard to . . . *the inherent bias to minimize value by Korschot in performing the task hired for*), and the court finds that the value of 500 shares of Midland Resources Inc. to be $2,660,000." (Emphasis added.)

This example further supports our decision to remand. The valuation of the 96% HFLP interest on March 1, 2000, is best left to the district court, so it may continue addressing, if not balancing, competing considerations. As a result, any valuation decision by the district court on remand should be reached after considering both—often at odds—public purposes contained in the spousal elective share statutes.

Kansas Divorce

On remand, the district court may find parallels with a divorce proceedings' property division. We have recognized that the new spousal elective-share provisions were "based upon two theories of the marriage relationship: the 'partnership theory' and the 'support theory.' " *In re Estate of Antonopoulos,* 268 Kan. at 181-82 (1999). "The partnership theory of marriage recognizes that both partners have contributed to the accumulated estate. See O'Sullivan and Bowen, *New Spousal Elective-Share Rights: Leveling the Playing Field,* 65 J.K.B.A. 18 (Feb./Mar. 1996); Uniform Probate Code Rev. Art. II, General Comment, 8 U.L.A. 93, 99 (1998)." 268 Kan. at 182.

Authors O'Sullivan and Bowen assert that "under the partnership theory of marriage, a spouse should have the same rights regardless of whether the marriage terminated by divorce or by death." They next observe that "[i]n Kansas, the courts have applied the theory of 'equitable distribution' in divorce situations, viewing marriage as a partnership to which both spouses contribute." 65 J.K.B.A. at 19. They conclude that "[c]onsistent with the partnership theory of marriage, the new law will bring the surviving spouse's rights at death more in line with those of a former spouse at divorce." 65 J.K.B.A. at 26 (citing *inter alia* K.S.A. 60-1610 [Subsection (b) provides in relevant part that "[i]n making the division of property the court shall consider . . . such other factors as the court considers necessary to make a just and reasonable division of property."]); see also 61 J.K.B.A. at 37 ("economic partnership theory of marriage is already reflected and carried out" under equitable distribution systems, including Kansas, when marriage dissolved by divorce).

We observe that in the divorce case of *Bohl v. Bohl,* 232 Kan. 557, 563, 657 P.2d 1106 (1983), an expert witness applied a 20% marketability discount to determine the value of stock in a closely held corporation for property division purposes. While the opinion is not entirely clear, it appears that the trial court accepted this part of the expert opinion testimony while rejecting another. This court affirmed the trial court's valuation which was between the valuation opinions of the two competing experts.

In turning to other jurisdictions for clearer guidance, we acknowledge that some allow discounts in divorce property divisions, while others do not. See Annot., 16 A.L.R. 6th 693, *Use of Marketability Discount in Valuing Closely Held Corporation or Its Stock.* For example, in *In re Marriage of Muelhaupt,* 439 N.W.2d 656 (Iowa 1989), after simply reciting the necessity of discounting stock in order to arrive at market value, the court allowed minority and lack of marketability discounts of stock in family's closely held corporation for property division in a divorce proceeding.

On the other hand, in *Webber & Webber,* 99 Or. App. 703, 784 P.2d 111 (1989), the court upheld the trial court's refusal to utilize minority or marketability discounts when valuing a husband's

shares of a closely held farming operation. Evidence revealed that the husband still farmed with his father, and the court found if he were to sell his stock, he would probably sell it to his parents without discounts.

Similarly, in *Brown v. Brown,* 348 N.J. Super. 466, 792 A.2d 463 (2002), the court disallowed discounts of stock in a closely held corporation for an equitable distribution of property in a divorce proceeding. It first likened the situation to dissenting shareholder appraisal rights, similar to this court in *Arnaud,* and then held:

"[N]o actual transfer of shares is involved in this equitable distribution case. That distinction makes the marketability discount even less appropriate than in the statutory appraisal or deadlock contexts, since *no sale of the business appears likely in the foreseeable future.* We see no reason to reward the spouse who holds title to the shares by allowing him to retain the value of the entire bloc at a bargain 'price,' that is, crediting the non-owner spouse with less than the owner's proportionate share of full value when determining equitable distribution of the marital assets. *Here, allowing the marketability or minority discounts would unfairly minimize the marital estate to Ellen's detriment and is inconsistent with the concept of equitable distribution.* While 'there is no ready market for the shares and consequently no fair market value' of [the company], [husband's] *shares in the going concern have value to him and to his co-owners that does not depend upon a theoretical sale to an outsider and has not changed as a result of the divorce complaint or judgment."* (Emphasis added.) 348 N.J. Super. at 489.

But in Wisconsin, for example, discounts are apparently allowed in divorce proceedings but disallowed in dissenting shareholder cases. In refusing to apply the discounts from Wisconsin divorce cases to dissenting shareholder cases, the court in *HMO-W Inc. v. SSM Health Care System,* 234 Wis. 2d 707, 611 N.W.2d 250 (2000), cited Comment e to A.L.I., Principles of Corporate Governance § 7.22, the same section cited with approval by this court in *Arnaud,* stating:

"However, the principles governing valuation of stock for tax or property division [divorce] purposes may not be imported into the appraisal [dissenting minority shareholder] process. *That is because the standard of valuation in any given context should reflect the purpose served by the law in that context."* (Emphasis added.) 611 N.W.2d at 258.

As mentioned, the district court in the instant case applied Meinhart's 10% discount to the MRI stock. Thus, as in *HMO-W Inc.,*

discounts could possibly be approved in the divorce-like context, *e.g.*, spousal elective share, despite not being approved in the *Arnaud* dissenting shareholder context.

*Issue 2: The district court did not err in determining the value of Norman's life estate interest in proceeds from the sale of the Nebraska farmland.*

Lawrence next argues that the Court of Appeals erred in affirming the district court's decision that the sale of the Nebraska farmland separated Norman's life estate from the remainder interest, resulting in the commuted value of his life estate becoming part of the augmented estate.

The augmented estate "includes the value of the decedent's probate estate, reduced by funeral and administration expenses, homestead or homestead allowance, family allowances and enforceable demands." K.S.A. 59-6a204. Whether the commuted value of the life estate was appropriately included in the augmented estate presents a mixed question of fact and law. The parties' dispute of the proper characterization of the sale requires this court to review whether substantial evidence supports the factual findings made by the district court. *U.S.D. No. 233*, 275 Kan. at 318. However, this court's review of the legal conclusions is unlimited. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 819, 104 P.3d 378 (2005).

As a result of a testamentary disposition from Norman's mother, he owned a life estate in farmland in Richardson County, Nebraska; Lawrence held a vested remainder. In September 1999, Lawrence, Norman, and Maryam sold the property under an alleged threat of condemnation to the United States Army Corps of Engineers for $292,950. The purchase price included both Norman's life estate interest and Lawrence's remainder interest. In December 1999, all of the proceeds from the sale were deposited into Lawrence's bank account.

Before the sale was completed, Lawrence arranged to purchase other property in Florida as a "like kind" reinvestment in order to avoid paying capital gains tax. Around the time of the purchase, Norman wrote to Lawrence: "It is my intent and has always been

that you retain ownership of the Florida Farm. I would like and need some of the profits but not to exceed 5% / year of value of money received from the Corp. of Engineers." Lawrence contributed all of the proceeds of the previous sale toward the purchase of the Florida property.

Before trial, the parties provided differing values of Norman's interest in the sale proceeds. Lawrence claimed the value was $23,478. This figure was based upon Norman's assignment of his share of the proceeds in exchange for profits from the Florida property computed at 5% per year of the Nebraska property value until his death 19 months later. Maryam, on the other hand, asserted that the value of Norman's share of the sale proceeds was $137,393.55, based on a calculation of his fractional interest in the proceeds using a "7520 rate" for the date of the sale. See 26 U.S.C. § 7520 (2000) (standardized valuation tables).

The district court determined that without Maryam's consent, Norman transferred his life estate interest to Lawrence within 2 years of his death. Based solely on the absence of her consent, the court adopted her proposed valuation of Norman's fractional interest in the proceeds.

To the Court of Appeals, Lawrence argued that the district court erred in including sale proceeds in the augmented estate, asserting that the forced nature of the sale, combined with the purported reinvestment agreement, did not separate the life estate from the remainder estate. In support, Lawrence cited authority prohibiting a court from separating a life estate from the remainder as part of a forced sale:

"*When not required by the exigencies of the situation*, the separation of life estates from estates in remainder, by estimating the values of the former and paying such values to the life tenants, constitutes an unnecessary and therefore unauthorized infringement upon the testator's intention. Hence, in the absence of some overpowering necessity, the court has no power to direct the separation of the life estate from the estate in remainder by estimating the value of the former and paying that value to the life tenant." (Emphasis added.) 51 Am. Jur. 2d, Life Tenants and Remaindermen § 105.

Based upon this authority, Lawrence argued that the district court separated Norman's life estate from Lawrence's remainder without a showing of any "exigent circumstances."

In contrast, Maryam disputed the characterization of the nature of the sale, asserting instead that it was voluntary. She further asserted that the treatise provision on which Lawrence relied was not applicable because it pertained exclusively to sales by court order. Instead, Maryam argued that the appropriate treatise section for reference was § 107, pertaining to voluntary sale by parties, which provides in part:

"When a life tenant and a remainderman unite in a *nonjudicial sale* of the property, without agreeing as to the division or disposal of the proceeds, the life tenant is entitled to receive, absolutely, from such proceeds the estimated value of his or her estate computed as of the time of the sale." (Emphasis added.) 51 Am. Jur. 2d, Life Tenants and Remaindermen § 107.

In affirming the district court's adoption of Maryam's proposed valuation, the Court of Appeals agreed with Maryam that the treatise law cited by Lawrence dealt exclusively with an " 'interest in real estate . . . *sold by court order*[,]' " and was therefore not applicable. 35 Kan. App. 2d at 791 (quoting 51 Am. Jur. 2d, Life Tenants and Remaindermen § 105). The court then quoted 51 Am. Jur. 2d, Life Tenants and Remaindermen § 104, discussing the importance of the judicial sale/nonjudicial sale distinction: " 'The judicial or nonjudicial character of a sale greatly affects whether a life tenant is entitled, or may be compelled, to receive from the proceeds of a sale of the property which was subject to his or her estate.' " 35 Kan. App. 2d at 791.

Although the Court of Appeals acknowledged that the district court characterized the sale as "forced," it noted that Lawrence admitted that he did not have to sell the property. 35 Kan. App. 2d at 791. The court concluded:

"The sale of the Nebraska realty was clearly not a judicial sale, and based upon this admission by Lawrence, it was not truly a 'forced' sale either. We adopt the rule set forth above as applicable, that when a life tenant and remainderman unite in a *nonjudicial sale of their property*, the life estate is entitled to receive the estimated value of his or her estate at the time of sale. We understand that this is precisely what Maryam's approach was intended to achieve.

"Given the stipulation as to the numerical calculation, we decline to examine the amount with more precision, and we affirm the district court's adoption of Maryam's approach together with the resulting inclusion of $137,393.55 in the augmented estate." (Emphasis added.) 35 Kan. App. 2d at 791-92.

In addition to arguing that the lower courts erred in separating the life estate from the remainder and including the commuted value of the life estate in the augmented estate, Lawrence also asserts that Court of Appeals erred in disregarding the district court's factual finding that the sale was "forced" under threat of condemnation and instead finding that the sale was voluntary.

At the outset we observe that contrary to Lawrence's general assertion, the record does not establish that the district court specifically found that the Nebraska property was sold under "threat of condemnation." However, he is correct that the court did refer to the sale as "forced," as demonstrated by its conclusion of law 9: "That the decedent transferred his interest in the *forced* sale of certain real estate to his son Lawrence within two years of his death without consent of his surviving spouse." (Emphasis added.)

However, the court made no factual findings supporting a forced sale. The court did refer to "a transfer of an asset to the son Lawrence."

"(a) The decedent owned a life estate interest for which his son Lawrence was the remainderman, in a parcel of real property in Richardson County, Nebraska . . . which parcel was sold to the Corps of Engineers on September 22nd 1999 for the sum of $292,000."

Even if we were so inclined, we would be hard-pressed to make a determination regarding force without observing witnesses. On the one hand, Lawrence testified the Army Corps of Engineers told him that it "wanted to condemn" the property and that the sale occurred "under threat of condemnation." On the other hand, although the Corps initially contacted Lawrence, the Corps accepted *Lawrence's* offer of sale. Lawrence also testified that he "didn't have to sell [the property]" and that he "voluntarily signed [the] contract."

More important, whether the sale was actually "forced" is not dispositive. As the Court of Appeals stated, according to 51 Am. Jur. 2d, Life Tenants and Remaindermen § 104, the present dispute first turns on the characterization of the sale as either judicial or nonjudicial, not forced or unforced. A "judicial sale" is defined as "[a] sale conducted under the authority of a *judgment or court*

*order*[.]'" (Emphasis added.) Black's Law Dictionary 1365 (8th ed. 2004). Regardless of whether the sale was "forced," the record does not demonstrate that it was required by court order or judgment. Further, Lawrence testified that eminent domain proceedings had not been initiated. We hold that the mere fact that the Corps *could* have condemned the property does not convert a nonjudicial sale into a judicial one.

Lawrence again cites 51 Am. Jur. 2d, Life Tenants and Remaindermen § 105. This section is not applicable because it specifically discusses property "taken in eminent domain." However, Lawrence also points to an additional section of 51 Am. Jur. 2d, Life Tenants and Remaindermen § 107, "Sale by parties," as in conflict with the rule adopted by the Court of Appeals:

> "Still another view is that in a voluntary sale, commutation will be denied on the theory that there is no right to commutation when statutory authority to commute does not exist. Under this view, if property owned by a life tenant and remaindermen is voluntarily sold by them, the life tenant is not, in the absence of an agreement as to the disposition of the proceeds, absolutely entitled to such portion of the proceeds as represents the present worth of his or her life estate calculated upon his or her expectancy of life as indicated by mortality tables, but he or she may take only the income from the reinvested corpus until the termination of his or her interest by death. In this connection, some of the authorities have said very, generally, without making any distinction between judicial and voluntary sales, that under ordinary circumstances, the life tenant is not entitled to have the value of his or her life estate commuted and paid to him or her in gross instead of the annual interest on the fund, unless the parties in interest agree to it."

This other section quoted by Lawrence does not appear to be the majority view; rather, the rule appears to apply in a limited number of states. See *Miracle v. Miracle*, 260 Ky. 624, 86 S.W.2d 536 (1935), and *In re Oertle*, 34 Minn. 173, 24 N.W. 924 (1885).

By contrast, the rule adopted by the Court of Appeals appears to be the rule of reason:

> "The rule of commutation, at least as applied to nonjudicial sales, seems to be the *rule of reason*, that the owner of a life estate upon the sale thereof, in like manner as the owner of an interest in fee upon the sale thereof, is entitled to and perhaps should be compelled to take, the consideration received therefor." *Mt. Freedom Presbyterian Church v. Osborne*, 81 N.J. Super 441, 446, 195 A.2d 907

(1963) (citing 33 Am. Jur., Life Estates, Remainders and Reversions § 275, p. 768).

See also Annot., 102 A.L.R. 969, section III (in the context of sale by parties):

"[It] is held, *by the very decided numerical weight of authority*, that, where a life tenant and remaindermen unite in a nonjudicial sale of property, without agreeing as to a division or disposal of the proceeds, the life tenant is entitled to receive, absolutely, from such proceeds the estimated value of his estate computed as of the time of the sale." (Emphasis added.)

We conclude that the rule promoted by Maryam, and subsequently adopted by the Court of Appeals, should be adopted because it states a rational, majority view concerning nonjudicial sales. Such a rule undercuts the issues asserted by Lawrence.

Accordingly, the next question is whether Norman's handwritten note to Lawrence was an "agreement as to a division or disposal of the proceeds[.]" See 51 Am. Jur. 2d, Life Tenants and Remaindermen § 107. The district court ruled from the bench that the handwritten note from Norman expressing his desire for 5% profits from the reinvestment was not an enforceable agreement because it lacked Lawrence's signature and was not supported by consideration. Rather, it merely expressed what Norman expected. The Court of Appeals agreed, but without reference to a standard of review.

Whether a contract exists is a question of fact. *Reimer v. The Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998); see also *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 60, 643 P.2d 100 (1982) ("Where the evidence pertaining to the existence of a contract is conflicting a question is presented for the trier of fact."). An appellate court determines whether the finding is supported by substantial competent evidence; it is not concerned with evidence that might have supported contrary findings. 265 Kan. at 214. Our review of the language of the note itself reveals that such evidence exists to support the finding that no enforceable agreement, *i.e.*, contract existed, in addition to revealing the note's failure to speak to the actual disposal or division of the proceeds from the sale of the Nebraska property. Therefore, we affirm the district court and

the Court of Appeals on the issue of valuing Norman's life estate interest in proceeds from the sale of the Nebraska farmland.

Lawrence has also timely moved this court, pursuant to Supreme Court Rule 7.07(b) (2006 Kan. Ct. R. Annot. 57), for attorney fees and expenses incurred on appeal to this court in the amount of $47,093.28, with a supporting affidavit. Appellate courts are experts on the reasonableness of attorney fees. *Link, Inc. v. City of Hays*, 268 Kan. 372, 383, 997 P.2d 697 (2000). After consideration of all relevant factors and the motion, response, and reply, we conclude that Lawrence should recover an additional sum of $25,000 for reasonable attorney fees on appeal to this court, to be taxed as costs. See *Lee Builders, Inc., v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 862, 137 P.3d 486 (2006).

Affirmed in part, reversed in part, and remanded with directions on the issue of valuing Norman's 96% interest in HFLP transferred to Lawrence on March 1, 2000.

JOHNSON, J., not participating.

EVELYN Z. WILSON, District Judge, assigned.

DAVIS, J., concurring: I concur in the majority's decision to reverse the Court of Appeals' decision which affirmed the district court's determination of MRI value and reversed in part and remanded the case to the district court for determination of the valuation of the 96% Hjersted Family Limited Partnership (HFLP) interest as of March 1, 2000. The majority decision correctly points out the legal error of the Court of Appeals in its rejection of Korschot's additional discounts and the effect such a rejection had of "effectively eliminat[ing] the only evidence in the record on the value of the transferred 96% limited partnership interest in HFLP on March 1, 2000." Majority slip op. at 16 (citing *In re Estate of Hjersted*, 35 Kan. App. 2d 778, 786, 135 P.3d 202 [2006]). Addi-

tionally, the majority sets forth some of the legal concerns regarding the valuation. Both in its factual discussion and in its initial discussion of why it is reversing the valuation question, the majority generally discusses the statutory and case law to guide the district court upon remand. In doing so, the majority recognizes the district court's broad discretion when resolving factual questions and the majority, as did the Court of Appeals, recognizes that valuation is a question of fact.

This general discussion, with legal authorities cited, provides sufficient guidance for a district court to exercise its sound judgment and discretion on remand. I take no issue with this general discussion.

In the pages following the general discussion, however, the majority effectively circumscribes the discretion of the district court upon remand by providing the district court with what, in my opinion, is overly detailed guidance. Although this guidance is well intended, the road map that is provided implies favored rationales and, arguably, results. I write separately to express my view that in its well-meaning attempt to provide guidance, the majority has gone too far and has encroached on the discretion of the factfinder.

Our judicial system places great faith and trust in the district courts of this state and recognizes that in an adversarial system counsel for the parties help narrow both legal and factual issues for decision before the district court. On questions of fact, such as the question of valuation, our system recognizes that a district court is uniquely suited to resolving the issue. As the majority opinion recognized, if such a determination of fact is supported by substantial competent evidence, appellate courts affirm such findings.

The majority in this case, instead of trusting the district court to make a sound decision as to valuation on remand, provides detailed guidance that narrows, if not eliminates, discretion upon remand. It does so under the following headings: "Estate and Gift Tax Contexts"; "Kansas dissenting shareholder case law"; "Kansas Spousal Elective Share"; and "Kansas Divorce." I will briefly comment on each of the topics addressed by the majority opinion to illustrate my point.

## Estate and Gift Tax Contexts

The majority opinion finds that

> "the district court may possibly determine from these prior rulings that—contrary to the Court of Appeals' belief that '[a]t some time before his death, Norman apparently visited his attorneys and expressed a desire to disinherit his wife' (35 Kan. App. 2d at 781)—Norman's HFLP transfers instead were manifestations of his estate planning and business objective to pass the family business to Lawrence." 285 Kan. at 573-74.

I believe a reading of the entire section of the majority opinion indicates that such a determination by the district court upon remand is favored.

The majority opinion then states:

> "Should the district court determine that Norman's transfers indeed represented legitimate estate and business planning, or at least did not represent a desire to disinherit Maryam, it may also consider that, without more, discounts for lack of control and lack of marketability can appropriately be applied to interests in family limited partnerships. [Citations omitted.]" 285 Kan. at 574.

Again, the thrust of this section is to guide the district court to the position favored upon remand.

This section of the opinion concludes with tacit approval of what the district court might do upon remand:

> "In short, the district court may possibly find: that the HFLP interest transfers were manifestations of Norman's legitimate business and estate planning; that they would be entitled, at least for transfer tax purposes, to discounts for marketability and control; and that a similar rationale would allow such discounts for valuing those assets in the augmented estate for the spousal elective share purposes." 285 Kan. at 577.

## Kansas Dissenting Shareholder Case Law

While the majority opinion recognizes that the question of valuation is to be made by the district court on remand, it states that the court may consider whether Maryam is comparable to a minority shareholder entitled to an undiscounted value of HFLP interest. I ask the question, if the district court does not consider whether Maryam is comparable to a minority shareholder, would the district court be following the directions of this court upon remand? Further, if the district court considered the question of

whether Maryam is comparable to a minority shareholder but determined she was not, would the district court be exercising its discretion consistent with our opinion?

The majority opinion states that as part of the district court's calculus it should also acknowledge that it had previously accepted the 10% marketability discount of Meinhart in his evaluation of the MRI stock. The majority opinion notes that "this acceptance is obviously contrary to the outright rejection of the stock discounts in *Arnaud* [*v. Stockgrowers State Bank*, 268 Kan. 163, 992 P.2d 216 (1999)]." 285 Kan. at 578. Even though the case is remanded for a decision on valuation, are we telling the district court that its previous decision to accept the 10% marketability discount must be a part of its new decision on remand?

Kansas Spousal Elective Share

As the majority opinion advises, "the district court may possibly determine that the HFLP interest transfers represented legitimate steps toward a legitimate estate planning and business objective." 285 Kan. at 580. As I read the direction in this section, I would be reluctant, as a district court judge, to conclude that the "HFLP interest transfers" *did not* represent "legitimate steps toward a legitimate estate planning and business objective." 285 Kan. at 580. In other words, I believe the majority opinion suggests to the district court that it should decide this case upon remand in a certain way. In that same paragraph, the opinion states "[d]isallowance of those discounts by the district court could arguably be considered inconsistent with Norman's legitimate intent to benefit his son Lawrence (through substantially reduced taxes) via the HFLP interest transfers." 285 Kan. at 581. In my opinion this is a suggestion to the district court upon remand.

While the section concludes with a counter consideration the district court may consider in its calculus for decision, in my opinion the majority suggests that this court favors the granting of discounts.

Kansas Divorce

This section begins with the following language: "On remand, the district court may find parallels with a divorce proceedings' property division." 285 Kan. at 581. The opinion then considers numerous cases both in Kansas and in other jurisdictions throughout the country relating to property division cases in divorce actions. This section concludes with a statement that "the district court in the instant case applied Meinhart's 10% discount to the MRI stock. Thus, as in *HMO-W Inc.*, discounts could possibly be approved in the divorce-like context, *e.g.*, spousal elective share, despite not being approved in the *Arnaud* dissenting shareholder context." 285 Kan. at 583-84. Again, it appears to me that we are directing and guiding a decision by the district court instead of allowing the district court within its discretion to make the decision which we have, by our majority opinion, remanded to the district court.

I would conclude by saying that we need to exhibit more trust and less guidance, recognizing that the district court will exercise its sound judicial discretion and will be assisted in its decision by the evidence presented and by advocates supporting their respective factual and legal positions both in writing and orally.

In all other respects I concur in the majority opinion.

MCFARLAND, C.J., and LUCKERT, J., join in the foregoing concurring opinion.