213 P.3d 751 (2009)
In re METCALF ASSOCIATES-2000, L.L.C.
IAS Partners, Ltd., Patrick T. Hayes SEP, Patrick T. Hayes, an individual, and National Advisors Trust Company FSB, Appellees/Cross-appellants,
v.
Michael Chambers, Appellant/Cross-appellee,
Metcalf 2000 Manager Corporation, Defendant,
and Chambers & Associates Commercial Real Estate Service, L.L.C., Appellants/Cross-appellees.
IAS Partners, LTD, and Patrick T. Hayes SEP, Appellees/Cross-appellants,
v.
Michael Chambers, Appellant/Cross-appellee.
Michael J. Chambers, Appellant/Cross-appellee,
v.
Metcalf Associates-2000, L.L.C., Defendant.
No. 98,868.
Court of Appeals of Kansas.
August 14, 2009.
*755 John M. Duggan and Deron A. Anliker, of Duggan, Shadwick, Doerr & Kurlbaum, P.C., of Overland Park, for appellants/cross-appellees.
Mick Lerner, of Law Office of Mick Lerner, P.A., of Overland Park, for appellees/cross-appellants.
Before HILL, P.J., ELLIOTT and LEBEN, JJ.
LEBEN, J.
Michael Chambers appeals the district court's order dissolving a limited-liability company based on statutory authority to dissolve such a company when it is threatened with irreparable harm because its managers are deadlocked. The district court's decision was based on detailed factual findings and credibility determinations formed after 10 days of testimony.
Chambers tries to avoid any deference to the district court's factual findings of deadlock and irreparable harm by arguing as a matter of law that a company can't be threatened by irreparable harm if it's still profitable. But acceptance of that argument would remove the remedy the legislature provided for deadlocked companies until they had actually suffered harmand only the harm of actual losses or insolvency would count. That would ignore many other potential and serious harms, like lost profits, lost business opportunities, or the failure to realize other common expectations that may have been part of the company's business plan before the deadlock. The district court heard ample evidence that the corporate manager of Metcalf Associates-2000, L.L.C., was itself deadlocked and that the company faced irreparable injury. We cannot set aside its judgment that the company should have been dissolved.
In addition to the main dispute over whether the company should have been dissolved, the parties have raised several other issues ranging from a challenge to our jurisdiction to hear Chambers' appeal to the award of a finder's fee to an attorney who is not a party to the case. We will review each of these issues in some detail, but we have found no error in the district court's careful and thorough work in this case.

I. The District Court Properly Found that the Statutory Requirements for Dissolution of a Limited-Liability Company Were Met.

The overriding issue in this case was whether the statutory requirements for the dissolution of a limited-liability company had been met. The district court found that they had, and we review its ruling under the familiar standard governing an appeal from a judge-tried case: we must determine whether substantial evidence supports the district court's factual findings and whether those findings are sufficient to support its conclusions of law. U.S.D. No. 233 v. Kansas Ass'n of American Educators, 275 Kan. 313, 318, 64 P.3d 372 (2003).
The plaintiffs, IAS Partners and the Patrick T. Hayes SEP (a simplified-employee-pension plan), owned 50% of the limited-liability company, Metcalf Associates-2000, L.L.C. (Metcalf Associates), and Chambers owned the other 50%. A limited-liability company may either be managed by its members or by a manager. K.S.A. 17-7693(a). A separate corporation, Metcalf 2000 Manager Corporation (Manager Corp.), served as the general manager of Metcalf Associates; Patrick Hayes and Chambers each personally owned 50% of the stock of Manager Corp. Chambers was named the president of Manager Corp.
Essentially, the working affairs of Metcalf Associates and Manager Corp. were jointly controlled by Patrick Hayes and Chambers. Chambers owned 50% of Metcalf Associates and 50% of Manager Corp. Patrick Hayes was the creator of the Patrick T. Hayes SEP, a tax-deferred retirement plan, which owned 30% of Metcalf Associates. Patrick Hayes also was the vice president of IAS Partners, which owned 20% of Metcalf Associates and was itself owned by the Hayes Family Trust. Bernard Craig, an attorney, was president of IAS Partners. And Patrick Hayes was the 50% owner of Manager Corp., which managed the affairs of Metcalf Associates.
*756 Under the facts as we have related them, Chambers and Hayes each owned 50% of both Metcalf Associates and Manager Corp. While this appeal involves issues that multiple parties raised in several consolidated lawsuits, we will generally refer to Chambers and Hayes rather than to all of the separate parties for the convenience of our discussion. We will refer to separate entities that Hayes owned only as necessary to discuss specific issues along the way.
Metcalf Associates purchased five office buildings making up the Metcalf 103 Office Park in Overland Park. Eighty percent of the purchase price was financed with a 3-year loan with Gold Bank. Hayes testified that he, Chambers, and Craig all agreed at the outset that the business plan for Metcalf Associates was to sell the buildings individually at a profit as quickly as possible. Hayes said that the 3-year term was chosen because he assumed they wouldn't hold any of the buildings longer than 3 years. But Chambers testified that he and Hayes had discussed the possibility that some of the buildings might be retained for long-term ownership.
Four of the five buildings were sold in April 2001, just less than a year after Metcalf Associates bought them. Those buildings sold for $3.3 million, which was $150,000 more than Metcalf Associates had paid to purchase all five buildings. The building that remained to be sold was the largest of the five. To provide a substantial cash distribution on the sale to the members of Metcalf Associates, the pro rata portions of the Gold Bank loan for the four sold buildings were paid backbut the remaining building still served as security for the remaining balance ($1.14 million) of the original loan. By leaving the loan in place against the fifth building, each member of Metcalf Associates received a cash disbursement of two or more times the initial cash investment.
Relations between Chambers and Patrick Hayes deteriorated over time, with noticeable problems beginning around the time the four buildings were sold. The fifth building was listed for sale through Chambers' real-estate brokerage, and that building remained unsold when IAS Partners and the Patrick T. Hayes SEP filed suit in April 2003 seeking to dissolve Metcalf Associates on the basis that it was deadlocked and to appoint a custodian for Manager Corp. on the basis that it, too, was deadlocked.
The statute that provides for the dissolution of a deadlocked limited-liability company differs somewhat from the one for the dissolution of a deadlocked corporation, but both require a dual showing of deadlock and irreparable injury. For limited-liability companies, K.S.A. 17-76,117(b) allows for owners with at least a 25% interest to petition for dissolution if the company's business "is suffering or is threatened with irreparable injury because the members ... are so deadlocked respecting the management of the affairs of the ... company that the requisite vote for action cannot be obtained and the members are unable to terminate such deadlock." If the court determines "that such irreparable injury and deadlock exists," then the court is required to order dissolution. K.S.A. 17-76,117(b). For corporations, a custodian may be appointed for a deadlocked corporation if its "business ... is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division." K.S.A. 17-6516(a)(2).

A. Manager Corp. Was Deadlocked.

The district court found that Manager Corp. was deadlocked because its two directors and equal owners couldn't agree on anything related to Manager Corp.'s sole function: management of Metcalf Associates. That conclusion seems straightforward and hard to argue against given the district court's detailed factual findings regarding Chambers and Hayes' inability to work together.
Chambers challenges this conclusion indirectly. The manager of Metcalf Associates is tasked with making any capital calls that may be needed. Chambers argues that since there was only one manager of Metcalf Associatesthe corporation, Manager Corp. there was no possibility of deadlock. See *757 K.S.A. 17-76,117 (referencing potential irreparable injury to limited-liability company when "the managers" are deadlocked).
But Chambers' argument misses the point of the district court's findings. The district court found that the manager, Manager Corp., was itself so deadlocked that it could not legally act on whether to make any capital calls. The district court found that the deadlock related to capital calls was in Manager Corp., not Metcalf Associates. Nor could Manager Corp. legally act on any other significant issue involving the management of Metcalf Associates, like setting a sales price for the remaining building or agreeing upon marketing of the building.
The articles of incorporation for Manager Corp. provided that Hayes and Chambers were its only directors. They were to serve until the first shareholder meeting or as provided for in the bylaws, but Chambers testified that he didn't recall any shareholders or directors meetings being held. Although Chambers was the president of Manager Corp., the district court also found that its bylaws provided for all powers of the corporation to be controlled by its board of directors and that under those bylaws no officer had authority to bind the corporation without authorization from the board. See also K.S.A. 17-6301(a) (affairs of corporation generally managed under authority of board of directors unless otherwise provided in articles of incorporation). The district court also found no evidence of authority for Chambers to act without Hayes' consent. Substantial evidence supported the district court's conclusion that Manager Corp. was deadlocked.

B. Metcalf Associates Was Deadlocked.

If the manager of a limited-liability company can't make any decisions of consequence, it would seem that the limited-liability company would be deadlocked as well. The only "out" from that deadlock would occur if the members of the limited-liability company could bypass the manager and handle the business interests of the company directly. But that wasn't happening for Metcalf Associates because its equal owners were totally at odds with one another.
The district court's finding of deadlock is well supported factually, so Chambers makes a legal argumentbased on the limited-liability company's operating agreementthat the company wasn't deadlocked. Metcalf Associates was set up for a specific purpose: to buy office buildings and then sell them for a profit. The operating agreement required the agreement of all members for certain acts, including selling real estate. Since the operating agreement required unanimous approval to sell real estate, Chambers argues that there can't be a deadlock because the members haven't yet fulfilled the requirement that all agree that it's time to sell.
Chambers is of course right that the operating agreement required that all members agree to the sale of company assets. But based on the district court's factual findings regarding the members' disparate interests in the final building's sale, the parties' disputes over the sale of that building and the refinancing of the Gold Bank loan can't reasonably be characterized as anything but a deadlock.
Let's consider some of the facts as found by the district court. The company bought five buildings financed through a 3-year loan. Hayes and Craig testified that the goal always was to quickly resell all of the buildings, and the fifth building was always listed for sale. That listing, however, was with Chambers, and the district court found that Chambers failed to adequately market the building and breached his duties to Metcalf Associates by listing the building with himself as broker when he wasn't really trying to sell it to anyone but himself. Chambers made three offers to Hayes to buy the building, but as the district court put it, Chambers wanted to buy it "at substantially less than fair market value." If a member who has engaged in bad-faith dealing could avoid a finding of deadlock whenever an operating agreement required unanimous approval for action, then any limited-liability company could be held hostage by unethical actors.
In sum, this was not a situation in which members had a mere disagreement regarding the specific sales price of a company asset to a third party. The evidence showed a fundamental disagreement between Hayes, *758 who wanted to sell all of the buildings within a short time, and Chambers, who ultimately wanted to acquire the fifth building for himself as a long-term investment. Perhaps, as Chambers suggests happened here, the operating agreement for a limited-liability company could be drafted to require unanimous approval for every significant decision of the company and specifically to limit the situations in which a deadlock may be declared by the courts. But the section of the Metcalf Associates operating agreement merely provided that the company's manager "may not without a unanimous vote" of the members sell any of the buildings or refinance the previous purchases. The legislature has provided a remedy for a deadlocked company, and we do not perceive any intention here for the operating agreement's requirement of unanimity to preclude a finding of deadlock and application of the statutory remedy for that.
Metcalf Associates was organized to buy and to sell some specific office buildings for a profit. Based on the district court's factual findings, there was a fundamental disagreement regarding how to handle the primary business of Metcalf Associates: should the remaining building be quickly and actively marketed and sold at the highest possible price or should it be retained by one or more members as a long-term investment? The district court's finding of deadlock was well supported in this record.

C. Manager Corp. and Metcalf Associates Were Faced with Potentially Irreparable Injury.

Chambers makes his strongest (yet still unsuccessful) argument on the irreparable-harm issue: how could Metcalf Associates be facing irreparable harm when by the time of trial it was owned free and clear and had substantial rental income? Chambers argues that it sets a dangerous precedent to allow judicial dissolution of a solvent, profitable company.
But Chambers doesn't directly address the basis for the district court's decisionthat Manager Corp. was itself deadlocked, leaving Metcalf Associates without a general manager. As such, Metcalf Associates faced irreparable injury because it had no management. Moreover, Metcalf Associates had no way to move forward with its key business, the sale of its remaining office building.
At the time Hayes filed a lawsuit seeking the declaration of a deadlock, the Gold Bank loan was coming due, and Hayes and Chambers could not agree on how to refinance the loan. Nor could they agree on whether to actively market the building for sale to others. And since those two individuals equally controlled both Metcalf Associates and Manager Corp., there could be no agreement either to replace Manager Corp. as general manager or otherwise to restructure the leadership of Metcalf Associates so as to break the deadlock. Business activity was stuck in a vicious circle that prevented any real businesssave for Chambers' rogue actionsfrom getting done.
Courts elsewhere have found deadlock when equal owners in a limited-liability company have lost the ability to communicate with one another and have demonstrated a pattern of being unable to agree on business matters. E.g., Polak v. Kobayashi, 2008 WL 4905519 (D.Del.2008) (unpublished opinion); Haley v. Talcott, 864 A.2d 86 (Del.Ch.2004). By contrast, Chambers cites two cases in which irreparable injury wasn't found, but neither is a close match for our case. In Blythe v. Blythe, 19 Kan.App.2d 427, 430, 870 P.2d 705 (1994), our court affirmed the district court's decision not to dissolve a corporation when the district court concluded on the factual record that the disputes between the owners had not been paralyzing the still-profitable corporation's business. That's certainly not the situation for Metcalf Associates, which at the time the suit was filed had listed its last office building for sale for 2 years without sufficient continuity of management to accomplish that objective. Chambers also cites Goldstein v. Studley, 452 S.W.2d 75, 80 (Mo.1970), which held that there was irreparable harm when a company's deadlock would inevitably lead to an inability to perform essential business functions and eventual insolvency. But the court didn't say that insolvency was a requirement for finding irreparable harm; it merely held *759 that it was a sufficient showing on the facts of that case.
K.S.A. 17-76,117(b) allows for judicial dissolution of a limited-liability company when its business "is suffering or is threatened with irreparable injury" due to deadlock of the members. By including both the actual suffering of irreparable injury and the mere threat of that injury, the legislature has implicitly rejected Chambers' argument that a company can't be dissolved so long as it's still solvent. The acceptance of Chambers' argument would negate lots of threatened harms that can occur to a business, including lost profits, lost business opportunities, and the failure to realize common expectations that had been part of the company's business plan. A district court may consider these, as well as actual insolvency, in deciding whether a sufficient threat of irreparable harm has been shown.
It is for the district court to determine factually whether a threat of irreparable harm has been shown. See National Bd. of Y.M.C.A. v. Flint Y.M.C.A., 764 F.2d 199, 201 (6th Cir.1985). We review a district court's factual determinations only to ensure that substantial evidence supports them. Owen Lumber Co. v. Chartrand, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). Evidence was ample here that Manager Corp. was itself deadlocked and that its deadlock had left Metcalf Associates adrift and unable to carry out the business for which it was organized.
Chambers separately argues that the district court wrongly concluded that Manager Corp. was threatened with irreparable injury since Manager Corp. had no debts and was managing a business that was solvent and had rental income. In short, Chambers claims that Manager Corp. was in no danger of being liable to Metcalf Associates because Metcalf Associates had no reason to complain. But Chambers once again fails to address the basis of the district court's decision. Here, the district court concluded that the deadlock in Manager Corp. was causing irreparable injury because it was so unable to take action as the manager of Metcalf Associates that Metcalf Associates couldn't act either. And a business organized to buy and sell office buildings that can't move forward with the sales part of that equation may lose profits or other business opportunities. Thus, the deadlock was leaving Manager Corp. unable to do the one thing it was created to do: manage Metcalf Associates so that it could sell its buildings. Given this, we cannot argue with the district court's conclusion that Manager Corp. faced potential liability, and thus the threat of irreparable injury, based on its inability to manage Metcalf Associates.
Chambers' argument that a judicial dissolution shouldn't be used to break up a solvent limited-liability company is better addressed to the legislature than to us. K.S.A. 17-76,117(b) provides that owners of at least 25% of a limited-liability company may seek court dissolution of the business, and the district court "shall order" dissolution "if the district court determines that such irreparable injury and deadlock exists." Evidence of deadlock was ample, and the district court found that irreparable injury was threatened despite the present solvency of the business. Under these circumstances, the statute required that the district court grant the dissolution of Metcalf Associates.

II. We Reject Hayes' Argument That Chambers' Appeal Is Procedurally Barred.

Hayes has made two arguments that Chambers didn't properly preserve his appellate rights. First, Hayes argues that Chambers' notice of appeal was filed too late. Second, Hayes argues that Chambers acquiesced in the district court's judgment by cooperating with the custodian who ultimately sold the fifth building after the district court authorized it.

A. We Have Jurisdiction to Hear the Appeal.

Hayes argues that we have no jurisdiction to hear the appeal because Chambers didn't file a timely notice of appeal. The procedural setting for this argument has some twists and turns that require us to set it out in some detail.
*760 The district court's detailed, 34-page memorandum decision was filed February 11, 2005. Chambers filed timely motions to alter or amend the judgment, which were ruled upon in a journal entry filed August 29, 2006. Chambers filed a timely notice of appeal within 30 days of that date. See K.S.A. 60-2103(a); L.P.P. Mortgage, Ltd. v. Hayse, 32 Kan.App.2d 579, 584, 87 P.3d 976 (2004).
But our court dismissed that first appeal on the basis that the district court hadn't yet taken final action in the case since proceedings were still taking place under court supervision to sell the final building and wind up the affairs of Metcalf Associates.
After the sale of the fifth building and resolution of the disputes regarding who should receive how much of the proceeds, the district court issued a final journal entry on May 8, 2007. That journal entry emphasized its finality: "No further order will be issued by the Court in these consolidated cases." Chambers filed a notice of appeal within 30 days. Thus, Chambers' 2007 notice of appeal was timely if that order was the final judgment on May 8, 2007.
Arguably, the first notice of appeal was correctly filed because posttrial motions had been ruled upon and all that remained to be done was in the nature of execution on the underlying judgment. But because we dismissed Chambers' first appeal for lack of a final order, Chambers had to wait until such a final order was issued and then appeal, which he did. To now conclude that Chambers' second appeal was untimely would leave Chambers in an impossible situation.
Our court's dismissal of the first appeal on the ground that it was not a final action should be respected here as the law of the case, which means that the decision on Chambers' earlier appeal is binding on this one. See Drach v. Bruce, 281 Kan. 1058, 1079, 136 P.3d 390 (2006). Accordingly, the district court's judgment did not become final for appellate purposes until May 2007 when the district court issued its final journal entry. Chambers timely appealed that ruling.
Hayes makes several additional arguments about why the appeal is untimely. He argues that only Chambers, and not Chambers & Associates, filed the motions to alter or amend judgment and the notices of appeal. But Hayes doesn't explain how this actually affects the jurisdiction of the case on appeal, especially since all of Chambers' appellate arguments relate to him personally. Hayes also argues that Chambers had the option under K.S.A. 60-1305 of appealing directly from the appointment of a receiver. But that statute isn't mandatory. It only says that a person "may, within ten (10) days, appeal from an order appointing or refusing to appoint a receiver without awaiting final determination of the proceeding." (Emphasis added.) We find no jurisdictional barrier to Chambers' pursuit of this appeal.

B. Chambers Did Not Acquiesce in the District Court's Judgment.

Hayes also claims that Chambers acquiesced in the district court's judgment by cooperating with the custodian and actively assisting with the court-supervised sale of the fifth office building. But Chambers spent considerable time in the district court opposing the appointment of a custodian and the dissolution of Metcalf Associates.
Hayes suggests that Chambers "permitted" the custodian to take over management of the fifth office building, something that happened under court order over Chambers' objection. A party need not risk contempt of court to avoid an accusation of acquiescence. We do not find acquiescence in the judgment based on the record of this case.

III. Chambers Has Shown No Error in Awarding Interest on Reimbursed Funds.

Chambers argues that the district court abused its discretion in its award of interest. During the dispute between Hayes and Chambers, Chambers paid off the Gold Bank loan, so he was entitled to reimbursement when the fifth building was later sold under court supervision. The district court determined that Chambers should be reimbursed for his payment of the principal plus interest at 5.3%the rate at which Chambers borrowed funds to pay off the loan. Chambers claims that he should have been *761 reimbursed at a rate of 9.25%, which was the interest rate on the Gold Bank loan, or at the statutory interest rate provided by K.S.A. 16-204.
We review an award of prejudgment interest for abuse of discretion. Varney Business Services, Inc. v. Pottroff, 275 Kan. 20, 44, 59 P.3d 1003 (2002). We find an abuse of discretion only when no reasonable person would take the view of the district court. In re Marriage of Bradley, 282 Kan. 1, 7, 137 P.3d 1030 (2006).
We find nothing unreasonable in the district court's award of interest at 5.3%, the actual rate Chambers paid on the funds he borrowed to pay off the Gold Bank loan. The district court separately found that Chambers acted in bad faith in paying off the loan against the wishes of the other members of Metcalf Associates, and that finding further leads us to conclude that the district court acted reasonably.

IV. Chambers Has Shown No Error in the District Court's Conclusion That Chambers Wasn't Authorized to Make a Capital Call.

Shortly before the suit was filed, Chambers notified the other members of Metcalf Associates that, in his capacity as manager of Metcalf Associates, he was making a capital call. After the suit was filed, Chambers contributed his part of the capital call, whichif recognized as validwould reduce the membership shares of the other members, who didn't contribute.
The district court found that the capital call was invalid on two bases. First, the court held that Chambers did not have the power to act on his own to make a capital call. Second, the court held that Chambers had not followed proper procedures for a capital call under the operating agreement.
Chambers presents a detailed argument on appeal about why he believes the procedure he followed complied with the operating agreement. But he doesn't directly address the district court's finding that the capital call was wrongly initiated because there was no consent to do so within Manager Corp. Instead, without directly addressing the district court's finding, he indicates that the decision to initiate a capital call was his alone as the general manager of Metcalf Associates.
But that claim is contrary both to the operating agreement for Metcalf Associates and to the district court's findings. Manager Corp. was the general manager of Metcalf Associates, not Chambers. Although Chambers was a 50% owner of Manager Corp. and its president, he wasn't the general manager of Metcalf Associates. The district court found as much, concluding that Manager Corp. was that general manager and that Hayes, as the other 50% owner of Manager Corp., had the authority to approve or disapprove of the initiation of the capital call. The district court noted that the bylaws of Manager Corp. did not authorize its president to act beyond the authority given by the board of directors, and it noted that the board of directors neither authorized a capital call nor Chambers' other general acts as a manager for Metcalf Associates. The district court's finding that Chambers wasn't authorized to make a capital call is supported by the evidence. Because the capital call was void at its outset for lack of proper authorization, we need not address the arguments regarding procedural defects in the capital call Chambers made.

V. Chambers Has Shown No Error in the District Court's Conclusion That He Acted in Bad Faith and Breached His Fiduciary Duties.

Chambers sought recovery in the district court of his litigation expenses under K.S.A. 17-6305 and 17-7670, which allows indemnification of corporate officers and limited-liability company members for expenses incurred in suits against them. The district court denied recovery because (1) Chambers had acted in bad faith and K.S.A. 17-6305(a) allows recovery only if the person has acted in "good faith" and (2) K.S.A. 17-7670(b) allows recovery only to successful litigants or as authorized in an operating agreement.
Chambers seeks to overturn the district court's denial of litigation expenses by showing that the district court's finding that he acted in bad faith is not correct. Chambers' *762 arguments are little more than an attempt to rehash the facts elicited at trial and to overcome the district court's extensive factual findings, which were heavily dependent upon its finding that Chambers' testimony wasn't believable. Indeed, the district court said directly, "Mr. Chambers' testimony was not credible."
An appellate court cannot make credibility determinations, and we must affirm a district court's factual findings when substantial evidence supports them. See In re Estate of Hjersted, 285 Kan. 559, 571, 589, 175 P.3d 810 (2008). We could review in detail the evidence upon which the district court made its determination that Chambers acted in bad faith. For example, the district court concluded that Chambers made no attempts to sell the fifth building despite his agreement to do so in the real-estate listing agreementa matter of particular importance to a company that existed solely to buy and sell office buildings and that only had one building left to sell. Rather than extending this opinion with a discussion of all of the other evidence, however, we simply note that in addition to the district court's credibility finding, there is ample evidence that Chambers was acting in his own interests and contrary to those of Metcalf Associates. So long as there is substantial evidence supporting the district court's findings, we cannot overturn them even though other evidence might have suggested a different interpretation of the facts. See Hjersted, 285 Kan. at 589, 175 P.3d 810.

VI. Chambers Waived Any Defense Regarding Hayes' Ability to Sue.

Chambers separately attacks the validity of the lawsuit dissolving Metcalf Associates by arguing that the plaintiffs were not owners of at least 25% of the limited-liability company, which was required to bring the lawsuit. Chambers' argument rests on a claim that the Hayes SEP, which owned 30% of Metcalf Associates, didn't own an interest in Metcalf Associates, and that its custodian didn't properly authorize the suit and failed to properly ratify the suit after it was brought. If the Hayes SEP wasn't properly a party to the operating agreement or the suit, then Hayes' 20% interest in Metcalf Associates through IAS Partners wouldn't have been sufficient to meet the 25% ownership threshold set out in K.S.A. 17-76,117(b). Thus, Chambers' argument goes entirely to the capacity to sue for dissolution.
But Chambers didn't question the capacity of Hayes and his business entities to bring suit until after the district court had decided the case, which waives the issue. A party waives the defense challenging another party's capacity to sue if the claim isn't raised in a timely manner. Vorhees v. Baltazar, 283 Kan. 389, 397, 153 P.3d 1227 (2007); see K.S.A. 60-209(a). The district court found that Chambers had waived this defense, and we agree.
We review for abuse of discretion a district court's decision regarding waiver of a defense because it was raised too late. Under that standard, the district court's decision is upheld unless no reasonable person would agree with it. Chambers admitted in his answer to the lawsuit that he formed Metcalf Associates and entered into the operating agreement with both IAS Partners and the Hayes SEP. His claim that the Hayes SEP never entered the operating agreement is contrary to this judicial admission. Further, his claim that the Hayes SEP didn't properly authorize the suit questions whether the Hayes SEP is a proper party to the suit, which should have been raised before judgment was initially entered. On these facts, the district court did not abuse its discretion in deciding that Chambers had waited too long to raise issues about the plaintiffs' capacity to sue.

VII. Hayes Has Not Shown Error in His Cross-Appeal.

Hayes has cross-appealed, asserting two errors. First, he argues that a $28,000 finder's fee should not have been paid to Gregory Blume, who served as Chambers' attorney at trial. Second, he argues that the district court should not have approved disbursements that would reimburse Chambers for a loan-origination fee.

*763 A. We Have No Authority to Grant the Requested Relief Regarding the Finder's Fee.

The finder's-fee issue that Hayes raises has some logical merit to it, but we have no authority to grant the relief he seeks. Blume asked for a $28,000 finder's fee for proposing the ultimate buyer for the fifth building. The district court awarded the fee, concluding that "although [Blume] was not working for the receiver, he was doing his professional duties as an attorney in this case when he secured the buyer and it benefitted everybody in the case." Thus, the district court awarded Blume a finder's fee.
Hayes argues that only licensed brokers may recover a finder's fee and that an exception provided by statute for services performed as a licensed attorney can't apply since Blume neither worked for the custodian of Metcalf Associates nor had the custodian's authority to find a buyer. See K.S.A. 58-3037.
Arguably, Hayes is right that Blume should not have been entitled to a finder's fee simply because he is an attorneyhis performance of professional duties as Chambers' attorney didn't involve the task of finding a buyer. But even assuming that Hayes is right about that, we don't have authority to order the relief Hayes now seeks: Blume's repayment of the finder's fee. Blume is not a party to this litigation; he isn't even currently acting as Chambers' attorney in this suit. Thus, we have no power over him.
Hayes recognized this roadblock and, prior to briefing, filed a motion with this court in May 2008 to add Blume as a party. In that motion, Hayes conceded the point: "Since Mr. Blume is no longer counsel of record for appellants, appellees lack the means with which to execute on him if and when this Court reverses the District Court, and requires Mr. Blume to repay the $28,000 amount to the parties." The motion to add Blume as a party was denied in June 2008.
Because Blume is not a party, we cannot order him to repay the finder's fee. Apparently in recognition of that, Hayes argues that Chambers should be responsible for reimbursing the finder's fee because he opposed the motion to add Blume as a party and Chambers has posted a supersedeas bond, which prevents the execution of a judgment during an appeal. Neither claim provides a legitimate basis for holding Chambers liable for the finder's fee paid to Blume. Thus, without deciding whether Blume was entitled to the finder's fee, we conclude that no error has been shown on this issue because we have no ability to grant the relief Hayes requests.

B. Hayes Has Not Shown an Error in the Reimbursements Paid to Chambers.

The district court approved reimbursement to Chambers for a loan-origination fee that Chambers said he originally paid in connection with the Gold Bank loan. Hayes opposed that reimbursement on the ground that Chambers hadn't produced evidence that Chambers actually had paid the fee. The district court concluded in an order on May 8, 2007, that if Chambers produced evidence that he had paid the fee, he was entitled to reimbursement.
Hayes continues to object to payment of the fee, but he does not cite to a document in our record showing that the fee actually was reimbursed to Chambers. The custodian's final accounting did recommend payment of funds in the amount of $1,271,572.90 to Chambers, but nothing in the final accounting showed a payment of the loan-origination fee. The recommended disposition of Metcalf Associates' funds set forth in that final accounting only shows that the loan-origination fee was paid by the company, not that it was credited to Chambers. That final accounting was approved in the final journal entry dated May 8, 2007.
An appellant must designate a record that affirmatively establishes the claimed error. Without such a record, that claim of error fails. City of Mission Hills v. Sexton, 284 Kan. 414, 435, 160 P.3d 812 (2007). Hayes simply has not cited in his brief to any point in the record that shows that Chambers was actually paid the loan-origination fee; the district court's journal entry only states that the fee should be reimbursed to Chambers if he presented evidence he paid it. And in contrast, the final accounting suggests *764 that the fee was not paid to Chambers. Hayes' claim of error on this point fails.

Conclusion
The parties presented complicated issues and highly divergent testimony to the district court in a trial that lasted many days. We are impressed with the care given to the case by the district court and by its detailed, 34-page memorandum decision. Because the district court's factual findings are supported by substantial evidence and we have found no legal errors in its rulings, we affirm the judgment of the district court.